NORTH AMERICAN SERVICE CO., INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

NORTH AMERICAN SERVICE CO., INC., NORTH AMERICAN SERVICE COMPANY AND HIGHWAY ADVERTISING COMPANY OF NEW YORK, INC., PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 61968, 61969.   Filed January 18, 1960.

*Ralph E. Davis, Esq.*, and *William P. Sutter, Esq.*, for the petitioners.

*Don S. Harnack, Esq.*, for the respondent.

TRAIN, *Judge:* Respondent determined deficiencies in income taxes of petitioner North American Service Co., Inc., for the period October 17, 1951, to December 31, 1951, in the amount of $9,044.67 and of petitioners North American Service Co., Inc., et al., for the calendar year 1952 in the amount of $37,874.62. The issues are:

(1) Whether the liquidation of North American Service Co. on October 31, 1951, was a complete liquidation within the meaning of section 112(b)(6) of the Internal Revenue Code of 1939, as contended by the respondent, so that the basis of the assets acquired

remains the same in the hands of petitioner (transferee) as in the hands of the transferor, or whether the petitioner is entitled to its cost of acquisition as the basis of the assets;

(2) If petitioner's basis is its cost of acquisition, what portion of the total cost of acquisition of the North American Service Co., Inc.'s assets is properly allocable to service contracts acquired in the liquidation; and

(3) Whether petitioner may deduct, in either 1951 or 1952, interest properly accruable in 1951 but paid on or after May 31, 1952, to its controlling stockholder.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are hereby found as stipulated.

Petitioner, North American Service Co., Inc. (hereinafter referred to as Service, Inc.), is a Delaware corporation organized on October 17, 1951, with its principal office at 341 West Superior Street, Chicago, Illinois. Petitioner, North American Service Company (hereinafter referred to as Service Co.), was an Illinois corporation organized in 1919. Its principal office was likewise at 341 West Superior Street, Chicago, Illinois. Petitioner, Highway Advertising Company of New York, Inc. (hereinafter referred to as Highway), is an Illinois corporation. Service Co. and Highway were wholly owned subsidiaries of Service, Inc., during the calendar year 1952.

Petitioner, Service, Inc., an accrual basis taxpayer, filed its income tax return for the taxable period October 17, 1951, to December 31, 1951, with the collector of internal revenue for the first Illinois district. A consolidated income tax return for the calendar year 1952 was filed by petitioners with the collector of internal revenue for the first Illinois district.

Service Co. was in the highway advertising business. It manufactured highway advertising signs of various sizes, up to and including displays measuring 11½ feet by 23 feet, obtained leases for the erection of the displays and rented the displays to various customers. Service Co. employed erection and maintenance fieldmen, salesmen, factory men, general office employees, supervisory employees, and art employees. The principal salesmen were D. A. Brumbaugh, Service Co.'s founder and principal owner, and Robert Hubbard. Brumbaugh was one of the early members of the Roadside Business Association, and, as owner of Service Co., had earned the reputation of being a good businessman and strong competitor by 1940. The business of Service Co. was national in scope and considered an excellent operation by its competitors and customers during the period around 1940.

D. A. Brumbaugh originally had intended to build up the business

and leave it to his sons upon his death. However, the son whom he expected to take over the operation of Service Co. was killed during World War II. He had little confidence in the other sons so that after the war he began to lose the keen interest and competitive spirit that had characterized his activities in the advertising business in earlier years. However, he remained a competent salesman and Service Co. was able to continue the rate of business previously enjoyed, despite the fact that Brumbaugh did not give the same attention as previously to customer relations. He allowed the signs to become rundown and in many cases they were in need of rebuilding or repainting. At times the reflecting material known as "STARLUME" fell off the signs so that the latter could not be seen at night. Although customers complained about the condition of the displays and stated that they were not getting their money's worth out of the displays allowed to deteriorate, Brumbaugh made no real effort to satisfy them or correct the condition of the signs.

Sometime around 1951, Brumbaugh decided to sell the business. Morris F. Swaney heard from individuals in New York that Brumbaugh was going to sell the business and Swaney in turn contacted Hubert E. Howard and discussed the possibility of acquiring the business. Howard was to supply the capital.

Swaney and Howard contacted Brumbaugh in June 1951 and offered to buy the assets of Service Co. Brumbaugh, however, stated that he would not consider selling the assets because a double tax would result. Instead, he offered to sell the stock of Service Co. Again, in the early fall of 1951, a group headed by Howard entered into further negotiations for the purchase of the business of Service Co. After negotiating for the purchase of the assets and being told that Brumbaugh would sell only the stock of the corporation because of the double tax which otherwise would result, the group organized Service, Inc., to acquire Service Co.

On October 22, 1951, a special meeting of the board of directors of Service, Inc., was held at which time the acquisition of Service Co. was discussed. The minutes of the meeting and resolutions passed at that time include the following:

The chairman then stated that negotiations had been carried on for the purchase of the business assets of North American Service Co., an Illinois corporation, however, that company was not willing to sell its business assets. He pointed out that the stockholders of that company were quite willing to sell their stock. The chairman then stated that in order to acquire the business assets of North American Service Co. it would be necessary for this company to purchase all of the issued and outstanding stock of that company and to immediately, after such acquisition, partially liquidate that company in order to get the assets desired, and he stated that he deemed it advisable for this company to do so. The chairman then presented to the meeting a copy of a proposed contract between the stockholders of North American Service Co. and the company. He stated that if this company should purchase the stock of

North American Service Co., the partial liquidation of that company would be effected through the distribution to this company, the sole stockholder of North American Service Co., of all of its assets, subject to its liabilities, except for $5,000. in cash, and that the final liquidation and dissolution of that company should not be effected earlier than April 1, 1955, and not later than December 31, 1955, and that the authorized capital of North American Service Co. should be reduced to $5,000, represented by 50 shares of common stock, par value $100 each.

After a full discussion of the matter, on motion duly made, seconded and unanimously carried, the following resolutions were adopted:

WHEREAS, this company desires to obtain the business assets of North American Service Co. and negotiations have been carried on to that end; and

WHEREAS, North American Service Co. has refused to sell its assets; and

WHEREAS, the stockholders of North American Service Co. are quite willing to sell their stock in that company and it appears that in order to obtain the business assets of North American Service Co. it will be necessary to purchase the stock of that company and follow such purchase by an immediate partial liquidation of North American Service Co.; and

WHEREAS, this Board of Directors deems it advisable and necessary for this company to borrow the sum of $900,000, to obtain the funds needed in connection with the purchase of the stock of North American Service Co. and in order to meet current obligations;

Now, THEREFORE, BE IT RESOLVED, That the Chairman of the Board of Directors and the Secretary of this company be and they are hereby authorized to enter into a contract for the purchase by this company, at a total price not exceeding $965,000, of all of the issued and outstanding shares of stock of North American Service Co., including both common and preferred stock, from the shareholders thereof, such contract to contain substantially the same terms and conditions as the aforementioned contract presented to this meeting, and that a copy of said contract be appended to these minutes.

On October 26, 1951, Service, Inc., through its officers, executed a contract for the purchase of all of the outstanding stock of Service Co. from its shareholders for a total consideration of $965,000. The contract of purchase provided in part as follows:

WHEREAS, SELLERS are the owners of all of the issued and outstanding shares of stock of NORTH AMERICAN SERVICE COMPANY, an Illinois corporation, with principal place of business in Chicago, Illinois (hereinafter called the "Company"), consisting of 700 shares of common stock of the par value of $100.00 each, and 500 shares of preferred stock of the par value of $100.00 each, owned by SELLERS as follows:

|  | Common Stock | Preferred Stock |
|---|---|---|
| D. A. Brumbaugh | 600 | 500 |
| Stanley L. Brumbaugh | 25 | --------- |
| Lavara H. Jacobsen | 25 | --------- |
| Robert T. Brumbaugh | 25 | --------- |
| Nell Brumbaugh | 25 | --------- |
| Total | 700 | 500 |

and the Company has in its possession 550 shares of common stock of the Company, and 250 shares of preferred stock of the Company which is all treasury stock, and

WHEREAS, PURCHASER is desirous of acquiring the assets and business of North American Service Company, but that Company is unwilling to sell the same, and in order to get such assets and business PURCHASER is desirous of acquiring all, but not less than all, of the issued and outstanding shares of stock of the Company, including both common and preferred stock, upon the terms and conditions hereinafter set forth;

Now THEREFORE, in consideration of the premises and of the mutual agreements and undertakings hereinafter set forth, SELLERS agree to sell and PURCHASER agrees to purchase 700 shares of the common stock of the par value of $100.00 each of the Company, and 500 shares of the preferred stock of the par value of $100.00 each of the Company, upon the following terms and conditions:

1. SELLERS represent and warrant:

1.1 That the Company is a corporation duly organized and existing under the laws of the State of Illinois, and that the authorized capital of the Company is $200,000.00, consisting of 1,250 shares of common stock, par value $100.00 each, and 750 shares of preferred stock, par value $100.00 each; and that of such authorized common stock of 1,250 shares, 1,250 are issued, fully paid and non-assessable, 550 thereof being held in the treasury of the Company and 700 thereof being outstanding; and that of such authorized preferred stock of 750 shares, all are issued and outstanding and are fully paid and non-assessable, 250 thereof being held in the treasury of the Company and 500 thereof being outstanding; and that no change in the authorized or issued stock of the Company will be made between the date hereof and the closing date hereafter specified.

    *        *        *        *        *        *        *

2. PURCHASER represents and warrants:

2.1 That PURCHASER will hold SELLERS free and harmless from any and all liability to Stuart W. Cochran and Company, or any individual connected with that firm, in connection with a commission, finder's fee, or any other similar charge sought to be recovered from SELLERS in connection with the sale of the stock both common and preferred, mentioned herein to PURCHASER. It is represented that any known claim for a commission of Stuart W. Cochran and Company, or any individual connected with that firm, will be adjusted by the Purchaser concurrently with the closing hereunder, and that satisfactory evidence of such settlement will be furnished to SELLERS upon closing.

2.2 That the execution and delivery of this agreement has been duly authorized by PURCHASER'S Board of Directors.

3. SELLERS will deliver to PURCHASER on the date of the closing, the resignations of each and all of the directors and officers of the Company and of Highway Advertising Company of New York, Inc.

4. On the closing date and at the time and place specified therefor, PURCHASER agrees to pay to SELLERS for delivery of said 700 shares of common stock of the Company, and the said 500 shares of preferred stock of the Company, a total fixed consideration of $965,000 cash, $915,000 of which shall represent payment for said 700 shares of common stock and $50,000 of which shall represent payment for said 500 shares of preferred stock.

5. Payment of said $915,000 to be made to SELLERS under this agreement for the common stock of the Company shall be divided and made to each SELLER in the proportion that the number of shares of the common stock of the Company sold by him or her bears to the 700 total number of such shares sold pursuant to this agreement.

6. That D. A. Brumbaugh, one of the SELLERS herein, agrees to indemnify PURCHASER only for any federal income tax deficiency which may be assessed against and paid by North American Service Company and/or Highway Adver-

tising Company of New York, Inc. for calendar years prior to calendar year 1951.

7. The date of closing hereunder shall be not later than November 1, 1951, at the office of Hopkins, Sutter, Halls, De Wolfe & Owen, 1 North LaSalle Street, Chicago, Illinois, the PURCHASER to notify SELLERS in advance of the time of closing.

8. The PURCHASER shall notify D. A. Brumbaugh in writing when it has received notice from the United States Internal Revenue Bureau that the government proposes to make an audit of the accounts of North American Service Company and/or Highway Advertising Company of New York, Inc., or any action by the government to establish a deficiency in federal income tax for a calendar year prior to 1951, and D. A. Brumbaugh shall have the right to be present at such examination in person, or by agent, and shall have the right to contest and defend such action or assessment in the name of the taxpayer at his own expense; and D. A. Brumbaugh, or his agent, shall have access to the books and records of said companies at any time it shall be necessary and requisite for these purposes.

In the event the PURCHASER fails to notify D. A. Brumbaugh of any proposed income tax examination by the government or denies him the right to contest or defend in the name of the taxpayer any proposed income tax deficiency or assessment, the provision for indemnification mentioned in Section 6, insofar as it relates to such taxable year examined, audited, or assessed by the government, shall be null and void.

Likewise, the PURCHASER agrees to give SELLERS access to the books and records of said companies at any time for the purpose of contesting or defending any proposed federal income tax liability or establishing the cost of their stock in connection with the personal income tax liabilities of any of the SELLERS.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

## EXHIBIT A

### STATEMENT OF ASSETS AND LIABILITIES

### NORTH AMERICAN SERVICE COMPANY

### SEPTEMBER 30, 1951

#### ASSETS

Current Assets:

| | |
|---|---:|
| Cash | $25, 482. 09 |
| Check on hand—(not deposited) | 16, 993. 68 |
| U.S. Treasury Certificates & Government Bonds | 261, 727. 50 |
| | 304, 203. 27 |
| Contract Payments | 498, 437. 10 |
| Inventories | 29, 169. 84 |
| Sundry Receivables | 2, 765. 14 |
| | 834, 575. 35 |
| Stock of Highway Advertising Company of New York, Inc | 24, 000. 00 |
| Contract Payments due Later | 812, 560. 30 |
| Machinery, Furniture & Fixtures, Automobiles & Trucks and other Equipment—Less Reserve | 15, 441. 84 |
| Formulae—Less Reserve | 150. 46 |
| Inter-Company Account (Highway Advertising Company of New York, Inc.) | (6, 736. 97) |
| Deferred Commissions | 7, 030. 50 |
| Prepaid Insurance | 2, 317. 86 |
| Total Assets | 1, 689, 339. 34 |

## LIABILITIES

Current Liabilities:

| | | |
|---|---|---|
| Accounts & Commissions Payable | | $11,734.30 |
| Unpaid Taxes | | 62,669.09 |
| Accruals | | 1,267.67 |
| Total Current Liabilities | | 75,671.06 |
| Deferred Contract Revenue—Less Unamortized Costs | | 1,104,649.28 |
| Unearned Commission Revenue (already received from Highway Advertising Company of New York, Inc.) | | 9,261.07 |
| Surplus Reserve | | 10,339.14 |
| Capital & Surplus: | | |
| Preferred Stock | $75,000.00 | |
| Common Stock | 125,000.00 | |
| Earned Surplus | 329,564.00 | |
| | 529,564.00 | |
| Less: Treasury Stock | 40,145.21 | 489,418.79 |
| Total Liabilities & Capital | | 1,689,339.34 |

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

## EXHIBIT H

## STATEMENT OF ASSETS AND LIABILITIES

## HIGHWAY ADVERTISING COMPANY OF NEW YORK, INC.

### SEPTEMBER 30, 1951

#### ASSETS

Current Assets:

| | |
|---|---|
| Cash | $15,396.33 |
| U.S. Treasury Certificates & Government Bonds | 25,000.00 |
| | 40,396.33 |
| Contract Payments | 52,324.80 |
| Sundry Receivables | 275.97 |
| | 92,997.10 |
| Contract Payments due Later | 86,083.75 |
| Deferred Commissions | 9,270.07 |
| Total Assets | 188,350.92 |

#### LIABILITIES

Current Liabilities:

| | | |
|---|---|---|
| Commissions Payable | | 9.00 |
| Unpaid Taxes | | 3,437.43 |
| Total Current Liabilities | | 3,446.43 |
| Deferred Contract Revenue—Less Unamortized Costs | | 142,017.26 |
| Inter-Company Account (North American Service Company) | | (6,736.97) |
| Capital & Surplus: | | |
| Common Stock | $25,000.00 | |
| Earned Surplus | 24,624.20 | |
| | | 49,624.20 |
| Total Liabilities & Capital | | 188,350.92 |

Highway was a wholly owned subsidiary of Service Co. on the date of the sales agreement. In accordance with the contract, Service, Inc., acquired all of the stock of Service Co. and expended $965,000 in cash plus a broker's fee paid on acquisition of the stock in the amount of $12,067.50.

A special meeting of the board of directors of Service, Inc., was held on October 26, 1951, at 2 p.m. The corporate minutes of that meeting include the following:

The chairman stated that a contract had been entered into with the stockholders of North American Service Co. for the purchase from them, at a total price of $965,000, of all of the issued and outstanding stock, both common and preferred, of North American Service Co., and that in that connection $900,000 had been borrowed pursuant to prior authorization by this Board. He further stated that the full purchase price, $965,000, had been turned over to the stockholders of North American Service Co. in exchange for all of the issued and outstanding stock, both common and preferred, of North American Service Co. He then stated that since the stock had been acquired in order to obtain the assets of North American Service Co., he considered it advisable that steps be taken for the partial liquidation of North American Service Co. through the distribution to this company, its sole stockholder, of all of its assets, subject to its liabilities, except $5,000 in cash, and that since, in his opinion, it would take several years to wind up the company's affairs, including its liability, if any, for federal income taxes, he recommended that the final liquidation and dissolution of the company should not be effected earlier than April 1, 1955 and not later than December 31, 1955, and that the authorized capital of North American Service Co. should be reduced to $5,000, represented by 50 shares of common stock, par value $100 each. The chairman suggested that these recommendations be passed on to the Board of Directors of North American Service Co. with a suggestion that it call a special meeting of the sole stockholder to consider and pass upon these matters.

After fully discussing and considering the statement of the chairman, on motion duly made, seconded and unanimously carried, the following resolutions were adopted:

WHEREAS, in the opinion of the board of directors of this company, it is for the best interests of this company, as sole stockholder of North American Service Co., that North American Service Co. be partially liquidated and that all of its assets, subject to its liabilities, with the exception of $5,000 in cash, which is to be retained, be transferred to this company, as sole stockholder, at or prior to the close of business October 31, 1951; and

WHEREAS, it is the opinion of the board of directors of this company that it will take several years to wind up the affairs of this company, including its liability, if any, for federal income taxes, and that it is advisable that the final distribution and liquidation be made after April 1, 1955, but not later than December 31, 1955.

Now, THEREFORE, BE IT RESOLVED, That the directors of this company do hereby recommend to the board of directors of North American Service Co. that North American Service Co. be partially liquidated and that its assets, subject to its liabilities, with the exception of $5,000 in cash, be distributed in partial liquidation to this company, as sole stockholder, at or prior to the close of business October 31, 1951.

BE IT FURTHER RESOLVED, That since the board of directors of this company believe that it will take several years to wind up the affairs of this company, including its liability, if any, for federal income taxes, it is recommended that the final distribution in liquidation of North American Service Co. be made after April 1, 1955, but not later than December 31, 1955.

BE IT FURTHER RESOLVED, That these recommendations for the partial liquidation of North American Service Co. be submitted to the board of directors of North American Service Co. at a meeting thereof.

The chairman then stated that he deemed it advisable for the company to enter into an employment contract with D. A. Brumbaugh, the president of the company, and, further, that the company obtain from D. A. Brumbaugh a covenant not to compete for a period of five years in any of the states of the United States except Idaho, Massachusetts, Mississippi, Nevada, New Hampshire, Rhode Island, Tennessee and Vermont. The chairman then presented to the meeting a copy of a proposed contract between the company and D. A. Brumbaugh, and suggested that such proposed contract be made a part of the minutes of this meeting. After a full discussion of the matter, and upon motion duly made, seconded and unanimously carried, the following resolution was adopted:

RESOLVED, That the chairman of the board of directors and the secretary of the company be and they are hereby authorized and directed to execute an employment contract with D. A. Brumbaugh which shall include a covenant on the part of D. A. Brumbaugh not to compete with the company for a period of five years in any state in the United States except Idaho, Massachusetts, Mississippi, Nevada, New Hampshire, Rhode Island, Tennessee and Vermont, such contract to be substantially in the form of the aforementioned contract which was made a part of the minutes of this meeting.

A special meeting of the board of directors of Service Co. was held on October 31, 1951, at 2 p.m., at which time the following resolution was adopted:

RESOLVED, That the board of directors of this company recommends to its sole stockholder that this company, North American Service Co., be partially liquidated at the close of its business October 31, 1951, such partial liquidation to be effected through the distribution to the sole stockholder of $50,000, in exchange for and cancellation of all of the preferred stock of this company and the further distribution to the sole stockholder of the balance of its assets (except $5,000 in cash) subject to its liabilities, in exchange for and cancellation of all of the common stock of this company, except $5,000, represented by 50 shares of common stock, par value $100 each;

FURTHER RESOLVED, That in order to complete the winding up of the affairs and business of this company, including the determination and satisfaction of its liabilities, it is recommended to the stockholder that final distribution and the dissolution of this corporation not be complete until after April 1, 1955, such liquidation and the dissolution of the corporation to be completed, however, not later than December 31, 1955;

FURTHER RESOLVED, That this board of directors also recommends to the stockholder that the authorized capital of this company be reduced to $5,000 represented by 50 shares of common stock, par value of $100 each, and that the proper officers of this corporation be authorized and directed to take such action as may be necessary and advisable to carry out this resolution;

FURTHER RESOLVED, That this board of directors recommends to the sole stockholder that upon the transfer of the assets of this corporation to said sole

stockholder, except for $5,000 as herein recommended, and the surrender and cancellation of all outstanding shares (except 50 common shares), appropriate action be taken for the cancellation of all shares of the corporation now outstanding, except said 50 shares of common stock, in comformity with the statutory provisions relating thereto.

FURTHER RESOLVED, That this board of directors recommends to the sole stockholder that upon the transfer of the assets of this corporation to said sole stockholder, in the manner and to the extent provided in the foregoing resolutions, steps be taken for the voluntary dissolution of this corporation and for the filing with the Secretary of State of the State of Illinois of a Statement of Intent to Dissolve by Voluntary Action pursuant to Section 76 of the Business Corporation Act of Illinois.

FURTHER RESOLVED, That the matters referred to in these resolutions be submitted to a special meeting of the stockholders of this company to be held, subject to waiver of notice by the stockholder, on October 31, 1951, at the hour of 2:15 P.M., to consider and act upon these matters.

At 3 p.m. on October 31, 1951, a special stockholders meeting and an adjourned meeting of the board of directors of Service Co. was held at which time the directors set forth the above resolution and upon their recommendation the resolution was adopted.

Pursuant to the action by the stockholders at the 3 p.m. meeting, Service Co. was partially liquidated as of the close of business on October 31, 1951, and all of its assets, except $5,000 in cash, subject to its liabilities of $87,872.42, were conveyed by appropriate instrument to Service, Inc., its sole stockholder, in exchange for all but 50 shares of its $100-par-value common stock. The authorized capital of Service Co. was reduced to $5,000, and the company was withdrawn from all States in which it was authorized to do business as a foreign corporation. It carried on no business activity subsequent to October 31, 1951. Service Co. was dissolved formally December 31, 1955.

Service, Inc., allocated the cost of acquisition of Service Co. stock to the assets received in liquidation based on the fair market value of those assets on the date of acquisition as determined by it. The allocation of the cost to the assets acquired, other than the service contracts, was as follows:

| | |
|---|---:|
| Cash | $269,452.80 |
| Inventories | 34,572.09 |
| U.S. Treasury bonds, Series F | 31,990.00 |
| Fixed assets (automobiles, furniture and fixtures, manufacturing equipment, and service equipment) | 14,989.62 |
| Erected displays | 187,668.26 |
| Deferred charges and formulae | 9,090.10 |
| Notes and accounts receivable—customers | 4,827.00 |
| Sundry accounts receivable | 219.47 |
| Accounts receivable from Highway Advertising Company of New York, Inc. (wholly owned subsidiary) | 8,456.09 |
| Highway Advertising Company of New York, Inc.—Common stock | 47,754.61 |
| Total | 609,020.04 |

Among the assets acquired by Service, Inc., in the liquidation, in addition to those listed above, were contracts covering 1,795 leases with 446 customers of Service Co. Those contracts had remaining consideration due to Service Co., as of October 31, 1951, in the amount of $1,268,269.04, payable over varying periods extending from 1 month to 10 years. Of the 446 customers, the largest accounts were the following:

| Customers | Number of displays |
|---|---|
| Stroehmann Brothers Co_____ | 125 |
| Purity Baking Co_____ | 24 |
| Heath Holsum Bakery_____ | 30 |
| B. Kuppenheimer & Co., Inc_____ | 257 |
| Pearl Brewing Co_____ | 86 |

During the period preceding the acquisition of Service Co. by Service, Inc., and particularly during the year 1951, each of the above customers and approximately 75 per cent of all customers were very dissatisfied with the service of the displays and Service Co.'s interest in their accounts.

The total revenue collectible each year by Service, Inc., under the contracts was as follows:

| Year | Revenue | Per cent of total revenue | Year | Revenue | Per cent of total revenue |
|---|---|---|---|---|---|
| 1951_____ | $84, 142. 92 | 6. 6 | 1958_____ | $5, 740. 00 | 0. 5 |
| 1952_____ | 478, 730. 22 | 37. 7 | 1959_____ | 4, 640. 00 | . 4 |
| 1953_____ | 367, 067. 20 | 28. 9 | 1960_____ | 3, 870. 00 | . 3 |
| 1954_____ | 180, 315. 30 | 14. 2 | 1961_____ | 1, 050. 00 | . 1 |
| 1955_____ | 76, 693. 90 | 6. 1 | | | |
| 1956_____ | 54, 909. 00 | 4. 3 | | 1, 268, 269. 04 | 100. 0 |
| 1957_____ | 11, 110. 50 | . 9 | | | |

Service, Inc., obtained Robert Bey, a certified public accountant, to review the records of Service Co. and determine the relationship of the cost of maintaining and servicing the boards to the revenue from the contracts. Bey determined that maintenance and servicing costs were roughly 18 per cent of contract revenue. Based on this determination, and the costs of obtaining the property lease and service contract, Bey estimated that the overall costs averaged out to about 30 per cent of the contract revenue.

Service, Inc., valued the $1,268,269.04 service contracts as being at least $450,919.88 and amortized the latter amount over the life of the contracts based on the percentage of revenue payable from month to month.

Shortly after acquiring Service Co., the operations of Service, Inc., were increased so that the customer goodwill, which had been falter-

ing in the last few years, could be restored. Customer relationship had deteriorated to the point that some customers discontinued their monthly payments. At the time of its acquisition of Service Co., Service, Inc., was not aware of the state of the customer relationship. By the end of 1952, Service, Inc., had expanded its work force from 23 to 45 employees, with the largest increase in service and maintenance. Service, Inc., endeavored to repair or replace all signs which were in rundown condition. In those cases where the customer had indicated definitely that contracts for advertising would not be renewed, largely due to the poor relationship which existed under Brumbaugh, Service, Inc., arranged periods of free advertising in the hope that the customer management would change its mind. Service, Inc., was partially successful in securing new service contracts with some of the customers who had previously discontinued outdoor advertising. The management of B. Kuppenheimer & Co., Inc., the largest customer of Service Co., informed the retail outlets for its clothes that Service Co. was under new management and that they, Kuppenheimer, were encouraging greater participation in outdoor advertising by sharing in the advertising cost with their dealers.

Service, Inc., had the right to Brumbaugh's services for a period after acquisition of Service Co. but found that his past relationship with customers hindered its plans to rebuild goodwill. Accordingly, Service, Inc., terminated Brumbaugh's employment. Service, Inc., continued the use of "STARLUME," the trade name of the reflecting material used on the boards. Service, Inc., also continued to use the stationery heading and correspondence forms previously used by Service Co. The only change in this regard was that the name of the company on the letterhead was altered from Service Co. to Service, Inc. Service, Inc., expanded its coverage of the outdoor advertising field from 40 to 44 States and sought additional customers for its operation.

Subsequent to 1951, respondent questioned the taxable liquidation status of the assets received by Service, Inc., and its valuation of the assets. In valuing the assets and goodwill of Service Co. as of October 31, 1951, respondent determined from Government publications, Department of Commerce records, and another outdoor advertising company in the Chicago area, that the normal rate of return for companies in the advertising field was 12 per cent on tangible assets and 15 per cent on intangible assets. Respondent then used the balance sheets filed with the tax returns of Service Co. for the period 1946 through October 31, 1951, to determine the actual return on assets. The computations were as follows:

## North American Service Company

### Chicago, Illinois

### Inc. Jan. 31, 1919

| Balance sheets items | 1946 | 1947 | 1948 | 1949 | 1950 | 10 months, ending Oct. 31, 1951[1] | Totals | Average 12T/70 |
|---|---|---|---|---|---|---|---|---|
| Cash | $31,779.28 | $18,048.67 | $94,329.42 | $17,204.01 | $31,016.82 | $269,537.14 | | |
| Accounts receivable | 472,453.08 | 1,007,935.92 | 1,045,006.05 | 826,094.75 | 1,049,299.58 | 1,286,949.00 | | |
| Inventory | 56,566.56 | 20,299.02 | 21,236.15 | 10,340.91 | 27,870.03 | 31,525.98 | | |
| Investments | 52,510.00 | 53,815.00 | 54,225.00 | 255,299.78 | 261,045.00 | 31,990.00 | | |
| Fixed assets (net) | 10,211.12 | 16,018.57 | 14,954.93 | 7,534.38 | 13,227.19 | 14,989.62 | | |
| Other investments | 24,165.00 | 24,165.00 | 24,165.00 | 24,000.00 | 24,000.00 | 25,000.00 | | |
| Signs erected | 81,144.03 | 215,291.62 | 181,148.87 | 120,716.53 | 132,598.23 | 187,668.26 | | |
| Deferred charges | 3,001.48 | 2,614.44 | 3,035.82 | 2,349.84 | 5,751.65 | 9,088.10 | | |
| Formulae | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | | |
| Total assets | 731,831.51 | 1,357,689.24 | 1,438,102.24 | 1,263,541.20 | 1,544,809.50 | 1,856,749.10 | $8,192,722.79 | |
| Accounts payable | 19,803.34 | 10,894.69 | 6,441.15 | 4,271.27 | 15,012.93 | 9,541.60 | | |
| Taxes | 7,447.68 | 26,214.03 | 56,193.08 | 58,651.54 | 53,066.08 | 77,853.41 | | |
| Other accrued expense | 3,403.54 | 2,817.06 | 2,331.18 | 943.49 | 5,402.83 | 627.90 | | |
| Deferred contract revenue | 466,210.04 | 999,692.22 | 1,033,167.00 | 812,337.86 | 1,036,596.59 | 1,268,269.04 | | |
| Reserve for estimated losses | 2,765.04 | 10,450.88 | 6,974.88 | 5,489.23 | 10,339.14 | 0 | | |
| Notes payable | | 50,000.00 | | | | | | |
| Total liabilities | 499,629.64 | 1,099,568.88 | 1,105,107.29 | 881,693.39 | 1,120,417.57 | 1,356,291.95 | 6,062,708.72 | |
| Net tangible assets | 232,201.87 | 258,120.36 | 332,994.95 | 381,847.81 | 424,391.93 | 500,457.15 | 2,130,014.07 | $365,145.27 |
| Net income per tax return | 21,840.70 | 65,887.24 | 145,167.92 | 149,644.04 | 127,869.76 | 118,557.41 | 629,967.07 | 107,994.35 |
| Income tax paid | 4,592.97 | 22,782.91 | 52,780.52 | 53,994.85 | 48,319.88 | 54,580.02 | 237,051.15 | 40,637.34 |
| Net income after taxes | | | | | | | | 67,357.01 |
| Average income on intangibles | | | | | | | | 23,539.58 |
| Average net tangible assets capitalized at 12%; $365,145.27 @ 12%— | | | | | | | | 43,817.43 |

Going concern value or goodwill value: $\dfrac{23839\,58}{0.15} = 156,980.53$

[1]This column per stipulation and 1951 tax return.

No value was given in this computation to the $1,268,269.04 contract revenue collectible over the period subsequent to acquisition.

On October 23, 1951, Howard, then majority stockholder of Service, Inc., and one of the original incorporators, loaned Service, Inc., $78,000 evidenced by a promissory note dated October 23, 1951, bearing 3 per cent interest and due 5 years from date. The note plus accrued interest of $2,866.50 was paid in full on January 14, 1953. On October 25, 1951, Howard loaned Service, Inc., $750,000 evidenced by a promissory note dated October 25, 1951, bearing 3 per cent interest per annum and due 90 days from date. This note plus interest was paid as follows:

| Amount paid | Date | Interest paid | Date |
|---|---|---|---|
| $200,000 | Jan. 16, 1952 | | |
| 50,000 | Apr. 17, 1952 | $13,823.58 | May 31, 1952 |
| 500,000 | Jan. 14, 1953 | 4,468.15 | Jan. 14, 1953 |

$4,640.52, included in the above total of interest paid, was accrued prior to December 31, 1951. No interest payment was made by Service, Inc., prior to May 31, 1952, but the $4,640.52 interest was deducted by it in computing its net income for the taxable period from October 17, 1951, through December 31, 1951. Howard owned at least 52 per cent of Service, Inc., stock from October 17, 1951, until January 14, 1953. Howard kept his books and prepared his returns on the cash receipts and disbursements method of accounting.

The value of the $1,268,269.04 service contracts received by Service, Inc., in liquidation of Service Co. on October 31, 1951, was $500,000. Service, Inc., acquired goodwill in the liquidation of Service Co., and the fair market value of that goodwill on October 31, 1951, was $156,938.53.

OPINION.

## Issue 1.

Respondent determined that Service, Inc., acquired the assets of Service Co., in a nontaxable liquidation of a subsidiary within the meaning of section 112(b)(6) of the 1939 Code. If this determination is correct, then the basis of the property acquired remains the same in the hands of the transferee as in the hands of the transferor. Petitioner, on the other hand, urges that the rule of *Koppers Coal Co.*, 6 T.C. 1209 (1946), and *Kimbell-Diamond Milling Co.*, 14 T.C. 74 (1950), affirmed per curiam 187 F. 2d 718 (C.A. 5, 1951), certiorari denied 342 U.S. 827 (1951), is applicable to the facts here before us. That rule provides that where a going business desires to acquire the asset of another corporation and the only means available by which

it can acquire that asset is to purchase all of the outstanding stock and liquidate the acquired corporation, the complete liquidation of the acquired corporation will be treated as one of the steps of a single transaction, namely, the purchase of an asset. The effect of this rule is that the purchase price of the stock becomes the basis of the asset acquired in the liquidation, consistent with the standard basis provision of section 113(a) that the basis of property is its cost.

Respondent argues that the *Kimbell-Diamond* rule is not applicable where a corporation acquires a going business and then continues that going business in a new corporate form, citing *Trianon Hotel Co.*, 30 T.C. 156 (1958), and *John Simmons Co.*, 25 T.C. 635 (1955), both of which found the *Kimbell-Diamond* rule inapplicable, and *Estate of James F. Suter*, 29 T.C. 244 (1957), in which the rule was applied. The petitioner contends that the *Kimbell-Diamond* rule should be extended to the situation where a going business is acquired and continued in a new corporate form, citing *M. O. J. Corporation* v. *United States*, —F. Supp. —(S.D. Tex., Mar. 17, 1959), on appeal (C.A. 5).

We are convinced that the *Kimbell-Diamond* rule is not necessarily made inapplicable simply because a going business is continued in a new corporate form. The rule itself was developed on the principle that substance, not form, should govern the tax consequences of a particular transaction. In determining whether, in substance, the objective of the transaction was the acquisition of property, it is necessary to consider all the relevant evidence, of which the failure to integrate the purchased assets into the business of the acquiring taxpayer may well be an important element. However, to make such failure conclusive of the determination, as contended by respondent, would introduce a new artificiality of form and create a rigidity of application inconsistent with the underlying purpose of the rule.

A similar view was expressed recently in *United States* v. *Mattison*, 273 F. 2d 13 (C.A. 9, 1959), where the court stated:

> The Kimbell-Diamond rule is not to be applied unless the purpose of the transaction was to acquire the assets of the company whose stock has been purchased. Evidence of such contemporaneous purpose is found where the acquired assets are immediately integrated into the business operations of the purchaser. But to conclude from this that integration must be shown to give application to the rule is to confuse the rule with one method of establishing its applicability.

There is no question but that certain of the decided cases lend at least superficial support to the respondent's position. In *Trianon Hotel Co.*, we stated that the *Kimbell-Diamond* rule does not apply when the acquiring corporation does not intend to integrate the ac-

quired assets into its own operations, a declaration which seems plainly at variance with the views expressed above. However, in that case we found that the underlying purpose of the transaction was not to acquire assets but rather to supply certain of the acquired corporation's majority stockholders with readily available funds which would not be depleted by a dividend tax. In view of this finding, the *Kimbell-Diamond* rule was clearly inapplicable so that the declaration referred to above was not necessary to the decision.

In *John Simmons Co.*, *supra*, we pointed out at page 642 that in the leading cases resulting in the application of the *Kimbell-Diamond* rule "the acquiring corporation had no purpose of continuing the business of the old corporation in a new corporate form." However, nowhere in the decision did we suggest that such a showing was a prerequisite to a finding of a purpose to acquire assets. On the contrary, it is apparent from the opinion that the fact that the old business was continued in a new corporate form was but one of several circumstances which the decision took into account. We found, for example, that there were at no time any negotiations whatsoever for the acquisition of any of the assets, as opposed to the stock, of the predecessor, a fact which, among others, distinguishes *Simmons* from the instant case.

In *Estate of James F. Suter*, *supra*, we found that the purpose of the stock acquisition was to acquire assets rather than stock in a going business. Again, it is clear from the opinion that we based our conclusion upon a consideration and weighing of all the circumstances involved.

In the two cases referred to above in which we refused to apply the *Kimbell-Diamond* rule, the facts disclose that there was a significant relationship between the interests who controlled and operated the acquired corporation and the interests who controlled and operated the acquiring corporation, a continuity of interest entirely absent from the instant case. In *John Simmons Co.*, *supra*, the stock of the new corporation was held, in large part, by the president and vice president of the old corporation and their families. The evidence established that it was the desire of the individuals who were in active conduct of the business of the predecessor to continue that business in corporate form. In *Trianon Hotel Co.*, *supra*, we found that the successor was owned by substantially the same stockholders as the predecessor and was managed by substantially the same officers.

We are satisfied from all the relevant evidence in the instant case that the primary purpose of the transactions involved was, in substance, the acquisition of assets. Therefore, the *Kimbell-Diamond* rule applies and petitioner is entitled to a basis in the assets it acquired equal to its cost of acquisition.

## Issue 2.

The parties are in agreement as to the total cost of acquisition, $1,064,939.92, of the assets received in the liquidation and are in disagreement only as to the proper allocation of that cost between the different assets acquired.

The petitioner allocated $609,020.04 to the assets other than the service contracts, allocated an additional $5,000 to the 50 shares of Service Co. stock still outstanding, and allocated the entire remaining balance of the cost, $450,919.88, to the service contracts. Petitioner does not contend that $450,919.88 represents the fair market value of the service contracts on October 31, 1951. Rather, petitioner contends that the contracts had a fair market value of more than the amount it allocated to them, but that after allocation to the other assets there remained only the assigned sum for allocation to the service contracts.

In his deficiency notices, the respondent disallowed in their entirety all deductions for amortization of the service contracts. However, recognizing that this Court might decide as we have that the petitioner is entitled to the cost of the assets as their basis, the respondent maintains alternatively that the petitioner erred in not allocating $156,938.53 to goodwill, an unamortizable asset. Moreover, on brief, the respondent asserts "the record amply supports a determination by this Court that * * * the amortizable value of the service contracts obtained in the liquidation does not exceed $319,870.10."

Respondent made a computation for the purpose of arriving at a value of the goodwill, if any, among the assets acquired by petitioner from Service Co. Respondent's valuation engineer testified that he made the computation in accordance with the formula set forth in A.R.M. 34, 2 C.B. 31. The formula in question has been employed frequently for the valuation of intangible assets, particularly goodwill, and the petitioner does not contest its use, in principle, in this instance. However, the petitioner contends that the respondent has erred in the computation, primarily in that he assigned little or no value to the service contracts.

The formula in question provides essentially as follows: To the "average tangible assets" of a business over a period of years (usually 5) is applied a normal rate of return (here 12 per cent); the return so computed is compared with the actual average earnings over the same period; the difference is considered "surplus" earnings attributable to intangible assets; the value of those intangible assets is then arrived at by capitalizing the so-called surplus earnings. The valuation engineer who made the computation determined that Serv-

ice Co.'s average net tangible assets had a book value according to the balance sheets filed with its tax returns of $365,145.27. Of this amount, the sum of $18,679.96 represented the value of the service contracts taken into account in the computation. Thus, the book value of the tangible assets other than the service contracts was $346,465.31.

The $18,679.96 which the respondent took into account in his computation with respect to the service contracts was the net between the $1,286,949 "Accounts Receivable" carried by Service Co. on its balance sheet as an asset and the $1,268,269.04 "Deferred Contract Revenue" carried as a liability. Under Service Co.'s method of accounting, contract revenue was not entered as an asset on its balance sheet without a corresponding liability or credit until it had been earned. The $18,679.96 which the respondent did take into account in his computation represents simply amounts currently receivable as of the closing date of the balance sheet. Thus, the respondent assigned a zero value for the purpose of A.R.M. 34 to the entire $1,268,-269.04 future earnings under the service contracts.

Those contracts did not constitute true accounts receivable, a fact recognized by the method by which Service Co. carried them on its books. The service necessary to mature these expectancies into true accounts receivable was still to be performed in the future. It is true that a considerable portion of the costs of acquisition and of display erection already had been incurred. However, it is equally true that a substantial portion of service and maintenance costs remained to be incurred. Recognizing that the contracts had a revenue expectancy is not to say that Service Co. had a net tangible asset of the same amount upon which normal earnings should be computed for purposes of A.R.M. 34. Under these circumstances, we cannot agree that respondent erred in his A.R.M. 34 computation by failing to assign an asset value to the contracts.

It is true that an A.R.M. 34 computation would not be conclusive of the existence and value of goodwill if better evidence were available, and the petitioner has endeavored to show that Service Co.'s relations with its customers were so bad that there was in fact no goodwill, although the testimony of Howard indicated that this supposed situation was not discovered by Service, Inc., until after the acquisition. That there was dissatisfaction among Service Co.'s customers there can be no denying but that is far from establishing that Service Co. had no goodwill. Indeed, the fact of the continuing and expanding business, including renewals, during the years up to the sale establish otherwise. In the light of all the evidence, the assignment of goodwill value by the respondent was not unreasonable, and

we have found that Service Co. possessed goodwill valued at $156,-938.53 at the time of liquidation.

The mere fact that a predecessor business possesses goodwill does not constitute proof that an acquiring corporation has purchased that goodwill. Nevertheless, having found the existence of goodwill in Service Co., and in view of the respondent's determination, the burden is upon petitioner to prove that it did not acquire that goodwill. The only possible indication to that effect was the testimony of Howard and Swaney that the objective of the acquisition was to liquidate the business over a period of years at a profit rather than to continue the business indefinitely. However, from its very inception, the history of Service, Inc., was that of a continuing and growing business. It was still actively engaged in the highway advertising business at the time of the trial. The entire course of activity of the petitioner is inconsistent with the stated purpose of liquidation. In the light of all the evidence, therefore, such weight as might conceivably be attached to the testimony of Howard and Swaney in this regard is insufficient to overcome the respondent's determination that goodwill was acquired by Service, Inc.

Of the total cost of $1,064,939.92 allocated by the petitioner to the various assets acquired from Service Co., the respondent has disputed only the $450,919.88 allocated to the service contracts. This amount was the only portion of the allocation disallowed in the deficiency notices. We conclude that this remaining cost should be allocated between the goodwill and the service contracts on the basis of the fair market value of each at the time of acquisition.

The fair market value of the goodwill has been established as $156,938.53. The respondent's valuation engineer testified that the value of the service contracts was $319,870.10. This value was not based upon expert opinion because the engineer was not qualified as such. He simply arrived at the stated value by a process of mathematical computation. The engineer took the total expected contract revenues, subtracted the ordinary expenses of selling, sign manufacturing, sign erection, and servicing, and then discounted the remainder back to October 31, 1951. However, from the very nature of these expenses it is obvious that a large portion of them already had been incurred by Service Co. at the time the contracts were entered into and the signs erected and that those same costs would not be incurred by Service, Inc., in earning the contract amounts. Therefore, using the method of computation employed by respondent's engineer, it is clear that the value of the contracts would be in excess of the $319,-870.10 assigned. A witness who qualified as an expert testified that under normal conditions the service contracts in question would have a fair market value of $650,000. However, he testified that the value would be less if the display signs were not in good condition. Using

our best judgment on the entire record, it is our conclusion and we have found as a fact that the contracts in question had a fair market value of $500,000 at the time of acquisition by petitioner. *Murray Thompson*, 21 T.C. 448 (1954), affd. 222 F. 2d 893 (C.A. 3, 1955). Allocating the remaining cost between the contracts and the value of goodwill, the amortizable cost properly allocable to the contracts is $343,196.92.

## Issue 3.

Respondent determined that $4,640.52 interest accrued during the period ending December 31, 1951, was not an allowable deduction in 1951 by reason of section 24(c) of the 1939 Code.

Section 24(c) provides:

SEC. 24. ITEMS NOT DEDUCTIBLE.

(c) UNPAID EXPENSES AND INTEREST.—In computing net income no deduction shall be allowed under section 23(a), relating to expenses incurred, or under section 23(b), relating to interest accrued—

(1) If within the period consisting of the taxable year of the taxpayer and two and one half months after the close thereof (A) such expenses or interest are not paid, and (B) the amount thereof is not includible in the gross income of the person to whom the payment is to be made; and

(2) If, by reason of the method of accounting of the person to whom the payment is to be made, the amount thereof is not, unless paid, includible in the gross income of such person for the taxable year in which or with which the taxable year of the taxpayer ends; and

(3) If, at the close of the taxable year of the taxpayer or at any time within two and one half months thereafter, both the taxpayer and the person to whom the payment is to be made are persons between whom losses would be disallowed under section 24(b).

The interest in question accrued in 1951, the year it became due. It was due from Service, Inc., to Howard. The latter owned more than 50 per cent of the outstanding stock of Service, Inc., so that the petitioner and Howard are persons between whom losses would be disallowed under section 24(b). The interest was not paid in 1951, the year in which accrued, or within 2½ months after the close of that year. We have found as a fact that Howard was a cash basis taxpayer. No evidence on this point was offered at the trial and, on brief, the petitioner contends that respondent failed to prove that Howard was not an accrual basis taxpayer. However, the burden of proof is on the petitioner and not on the respondent and, in the absence of any evidence to the contrary, we have assumed Howard to be on the cash basis, a fact essential to the applicability of section 24(c) and, thus, to the respondent's determination. Likewise, the petitioner has offered no evidence that the amount of the interest was includible in Howard's gross income "for the taxable year in which or with which the taxable year of the taxpayer ends." In the absence of such evidence, we must conclude that the interest was not

includible in Howard's income for the taxable year so described. Under these circumstances, section 24(c) clearly prohibits the deduction of the interest in 1951 as determined by the respondent.

The petitioner asserts alternatively that the interest is deductible in 1952, the year in which paid. In this case, section 24(c) would be inoperative because the interest payment presumably would have been includible in Howard's income. The only question is whether petitioner is entitled under section 23(b) for a deduction in 1952 for an interest payment made in that year but which had accrued in the prior year.

This specific problem has been discussed in detail in longstanding regulations of the respondent. Regulations 118, section 39.24(c)–1 contains the following example, clearly applicable here:

*Example.* A is the holder and owner of an interest-bearing note executed by the M Corporation, all the stock of which is owned by him. A and the M Corporation make their income returns on the basis of a calendar year but the M Corporation makes its returns on the accrual basis and A makes his returns on the cash receipts and disbursements basis. The M Corporation does not pay any interest on such note during the calendar year 1952 or within two and one-half months after the close thereof, but claims a deduction for the year 1952 with respect to the interest accruing on the note in that year. A, being on the cash receipts and disbursements basis, does not include such interest in his return for the year 1952. By the application of section 24(c), no deduction for such interest is allowable in computing the net income of the M Corporation for the year 1952. *The provisions of section 24(c) do not otherwise affect the general rules governing the allowance of deductions under the accrual basis. Hence, in the event the M Corporation should pay such interest after March 15, 1953, no deduction therefor would be allowable in computing its net income for the year in which the payment was made.* [Emphasis supplied.] [1]

Under closely related situations, we have denied accrual taxpayers a deduction for interest paid in the taxable year if the interest had accrued in a prior year. *Lincoln Storage Warehouses*, 13 T.C. 33 (1949), affd. 189 F. 2d 337 (C.A. 3, 1950); and *Burton Swartz Land Corp.* v. *Commissioner*, 198 F. 2d. 558 (C.A. 5, 1952), affirming a Memorandum Opinion of this Court on this point. Accordingly, since the petitioner here is an accrual taxpayer, it cannot deduct the interest payment made in 1952.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

---

Murdock, *J.*, dissenting: The interest in the amount of $4,640.52 should be allowed as a deduction for 1952. The amount was not deductible in 1951. However, it was not the purpose of section 24(c)

[1] The above example first appeared in Regulations 111, section 29.24–7, which were issued with respect to section 24(c) of the 1939 Code, effective for all tax years beginning after December 31, 1941, and including tax years which begin prior to December 31, 1951.

to eliminate completely such an item as a deduction merely because it was not paid within 2½ months after the close of the year in which it accrued. The intention was merely to delay the deduction until it was actually paid. Congress had noted that closely held corporations were accruing items as deductions whereas the stockholders to whom they were payable were not taking them into income because the stockholders were on a cash basis and had not actually received the payments. Congress enacted the quoted provisions of section 24(c) to make the deduction by the corporation depend upon payment to the stockholder, with consequent tax liability to the stockholder. It did not intend to deny the deduction permanently if the amount was actually paid. Section 24(c) modified section 23(b) to this extent.

FORRESTER, *J.*, agrees with this dissent.