**E. T. Griswold, et al.,[1] Petitioners, _v._ Commissioner of Internal Revenue, Respondent**

Docket Nos. 5250–63, 5253–63, 5254–63.   Filed February 21, 1966.

_Roger L. Davis_, for the petitioners.
_Kenneth G. Anderson_, for the respondent.

OPINION

Raum, *Judge:* 1. *Amortization of Location Costs.*—When all the assets of Independent No. 2 were taken over in January 1961 by the corporate petitioner herein, Independent No. 3, an item designated "Prepaid Location Costs" in the amount of $148,406.10 appeared as an asset on the opening balance sheet of the new corporation. No such asset was reflected in the closing balance sheet of its predecessor. It is the contention of Independent No. 3 that it is entitled to amortize that item over a 5-year period. We hold that these locations, which

were not shown to have any basis other than zero in the hands of the old corporation, must be treated on this record as having a zero basis, with the consequence that no deduction for amortization is allowable in respect thereof.[3]

The taxpayer's position rests upon the so-called *Kimbell-Diamond* rule which grew out of the decision in *Kimbell-Diamond Milling Co.*, 14 T.C. 74, affirmed 187 F. 2d 718 (C.A. 5), certiorari denied 342 U.S. 827, and which has been applied in a variety of situations. Cf., e.g., *United States* v. *M.O.J. Corporation*, 274 F. 2d 713 (C.A. 5) ; *Georgia-Pacific Corporation* v. *United States*, 264 F. 2d 161 (C.A. 5) ; *H. B. Snively*, 19 T.C. 850, affirmed 219 F. 2d 266 (C.A. 5) ; *North American Service Co.*, 33 T.C. 677; *Orr Mills*, 30 T.C. 150; *Estate of James F. Suter*, 29 T.C. 244; *Montana-Dakota Utilities Co.*, 25 T.C. 408. In substance, the *Kimbell-Diamond* doctrine is to the effect that where the stock of a corporation is purchased for the purpose of liquidating it and obtaining its assets, the transaction will be regarded merely as a purchase of those assets. Thus, it is the essence of petitioner's position that Griswold and Fielden were not interested in acquiring the stock of Independent No. 1; that they were interested only in the assets of that corporation; that they paid for the stock solely in order to liquidate the corporation and obtain those assets; that the most important asset owned by the corporation was reflected in the locations; that a substantial portion of the purchase price was accordingly paid for those locations; and that when Griswold and Fielden liquidated Independent No. 2 (which was merely the recapitalized Independent No. 1) and contributed the locations to Independent No. 3, the locations retained the same basis in the hands of the latter that they would have had in the hands of Griswold and Fielden, namely, that portion of the purchase price of the stock of Independent No. 1 that was allocable to the locations.

The difficulty with the foregoing position is that, granted that Griswold and Fielden were highly interested in the assets owned by Independent No. 1, we cannot find on this record that they purchased the stock of that corporation with the intention of liquidating it. To be sure, there is evidence that prior to the stock purchase the accountant, Lindfors, advised Fielden to liquidate the corporation. But the fact is that notwithstanding such advice, Griswold and Fielden en-

---

[3] The deductions for "Location Costs" claimed on the taxpayer's returns for its fiscal years ending June 30, 1961 and 1962, were in the respective amounts of $19,390.07 and $33,057.16. (The return for the fiscal year ending June 30, 1961, represented operations covering only a 6-month period.) The Commissioner disallowed these deductions to the extent of $14,472.02 and $28,944.05, respectively, which have been assumed to relate to amortization of the location costs appearing on the taxpayer's opening balance sheet. The nature of the remaining portions of the claimed deductions in respect of location costs which were not disallowed is undisclosed on this record.

tered into a contract for the purchase of the stock in which they covenanted explicitly:

That the corporate existence of the Company will be maintained at all times in good standing and that no change will be made in the authorized capital stock of the Company except that the Purchasers may change the authorized capital from 100 shares of no par value to 5000 shares of the par value of $1.00 each, provided that upon the reissue of such stock pursuant to an amendment to the Certificate of Incorporation, the re-issue stock shall be exchanged with the respective Sellers in the place of stock held as collateral for the payment of the promissory notes held by the Sellers, and provided further, that the Sellers shall always hold as collateral in their respective proportions all of the issued and outstanding capital stock of the company. The name of the corporation may also be changed.

Here then was a clear expression of a purpose *not* to liquidate the corporation. And in accordance with these provisions Independent No. 1 was thereafter recapitalized with a modification in its name which we have referred to herein as Independent No. 2.

We give but very little weight to the contention that the lawyer, since deceased, who represented Griswold and Fielden, failed to follow their instructions to liquidate Independent No. 1 and merely recapitalized it. We doubt on this record that any such instructions were ever given to the lawyer. Rather, the evidence more compellingly indicates that the lawyer was acting within the framework of the purchase contract which permitted a recapitalization but forbade a liquidation, and we do not find credible the suggestion that Griswold and Fielden, who signed the contract, had given their lawyer instructions which in effect required him to violate its terms. Nor do we find credible the suggestion that they were ignorant of the provisions of the contract. These provisions were clearly understandable by any businessman, and we do not believe that Griswold and Fielden were unaware of them when they signed the contract. Petitioner's entire position on this point rests upon evidence that does not carry conviction with us. Its burden of proof has not been met as to this issue.

In the circumstances, we cannot find that Griswold and Fielden purchased assets rather than stock, and accordingly we cannot find that the locations in question had a basis in their hands which they contributed to Independent No. 3. As a result, these locations which indisputably had a basis of zero in the hands of Independent Nos. 1 and 2 cannot acquire a stepped-up basis in the hands of Independent No. 3. The transaction whereby all the assets of the predecessor corporation were transferred to Independent No. 3, with the same stockholders owning their stock in the same proportions, was plainly a nontaxable reorganization and the zero basis for the locations was carried over in the hands of the new corporation. We do not under-

stand petitioner to contend otherwise, once it is decided that the *Kimbell-Diamond* rule is inapplicable.

To be sure, the entire matter might have been handled differently by the parties so as to enable them to provide a stepped-up basis for these locations. But tempting as it may be to try to relieve them of the consequences of their mistakes, we cannot do so on this record. The belated liquidation which occurred herein does not convince us that Griswold and Fielden intended to liquidate the corporation when they purchased the stock.

In view of our conclusion as to the zero basis for the locations we do not reach the Government's alternative contention in respect of this issue that the locations in question were a "mass asset" not subject in any event to amortization, having an indeterminate useful life. Cf. *Sam Scalis*, T.C. Memo. 1962-46; but cf. *Fall River Gas Appliance Co.*, 42 T.C. 850, affirmed 349 F. 2d 515 (C.A. 1).

2. *Payments on Notes.*—During the years 1961 and 1962, Independent No. 3 made payments to the Little River Bank & Trust Co. to be applied against the obligations of Griswold and Fielden on their purchase-money notes which were held by the bank for collection. As the payments were thus made the amounts of principal and interest allegedly owed by the corporation to Griswold and Fielden on the $85,000 "notes" which it had issued to each of them were reduced accordingly. We find that these $85,000 notes did not in fact represent a bona fide indebtedness of the corporation, with the result that the payments made thereon by Independent No. 3 were simply corporate distributions in behalf of its stockholders; such distributions were taxable to the stockholders as dividends to the extent of available earnings and profits, and no part thereof was properly deductible by the corporation as "interest."

Independent No. 3 came into existence as a result of the reorganization of Independent Nos. 1 and 2, as previously set forth. Prior to the reorganization, Griswold and Fielden each owned 50 percent of the outstanding stock of Independent No. 1, the total combined cost of which was $234,500. This stock was purchased in an arm's-length transaction. After the reorganization Griswold and Fielden each owned 50 percent of the stock in Independent No. 3. In addition to the stock, Independent No. 3 issued unsecured demand notes of $85,000 to each of them, for which they contributed no new property.

The record clearly establishes that these notes did not represent bona fide debts of the corporation. Rather, the evidence shows that they were issued merely to set the stage to enable Griswold and Fielden to withdraw corporate funds, tax-free to the extent of $85,000 each, to pay off the notes which they in turn had given on their purchase of the stock of Independent No. 1. The purpose of issuing these notes was

plainly revealed in the testimony of Lindfors, upon whose advice the notes were issued.    He testified as follows:

Q. I call your attention to January of 1961 at the time that Independent No. 3 was incorporated and the opening entries were made upon the books and records.

I hand you a copy of Exhibit 21–U and ask you to again tell the Court who made those opening entries?

A. My office did.

Q. Upon whose advice was that?

A. Upon my advice.

Q. Why did you advise that transaction to be handled in that fashion?

A. *In order that Mr. Fielden and Mr. Griswold could withdraw sufficient funds from this organization to pay off their personal obligations that they had signed in purchasing the stock of the old corporation.    I set it as $170,000 owing to them, $85,000 each.*    [Emphasis supplied.]

I had told them, in the first place, this was the only way they can operate this corporation.

We do not find it necessary to review the various cases in which corporate obligations have been held to be true debts in some instances or merely evidences of capital in other instances.    Suffice it to say that on this record we have found that the $85,000 notes did not in fact represent true debts.    Not only is this conclusion supported by Lindfors' testimony, but it is buttressed by all the surrounding facts including the fact that these notes were put up with the bank along with the stock in Independent No. 3 as collateral for the purchase-money notes of Griswold and Fielden under a contract calling for collateral of the "stock" or re-issued "stock."    Surely, these notes were regarded as "capital" by Griswold and Fielden as well as by the holders of their purchase-money notes, who acquiesced in the transfer of the business to Independent No. 3 upon receiving all the stock and the $85,000 "notes" as collateral.

The fact that payments were made directly to the collecting bank for their benefit rather than to Griswold and Fielden personally is of no consequence.    *Wall* v. *United States*, 164 F. 2d 462 (C.A. 4).

*Decisions will be entered under Rule 50.*