Fox & Hounds, Inc., a corporation v. Commissioner.
Fox & Hounds, Inc. v. Commissioner
Docket No. 77775.
United States Tax Court
T.C. Memo 1962-229; 1962 Tax Ct. Memo LEXIS 79; 21 T.C.M. (CCH) 1216; T.C.M. (RIA) 62229; September 27, 1962
Bruce I. Hockman, Esq., and Abram Salkin, Esq., for the petitioner. Walter S. Weiss, Esq., and Paul G. Wilson, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent determined a deficiency in income tax against the petitioner of $12,716.61 for the year ended June 30, 1955. The issues are (1) whether petitioner claimed excessive depreciation in the amount of $35,480.49, or in any sum, on depreciable assets acquired in the acquisition of a going restaurant business, and (2) whether petitioner is entitled to deduct $2,000 for the amortization of an agreement not to compete. In each issue there is the question whether good will was one of the assets acquired in the purchase of the *80 restaurant business and its assets. Findings of Fact Some of the facts have been stipulated and are found as stipulated. Petitioner is a California corporation organized in July 1954, with its principal place of business at 2900 Wilshire Boulevard, Santa Monica, California, where it operates a restaurant known as the Fox and Hounds. It filed its income tax return for the taxable year with the district director of internal revenue at Los Angeles, California. In or about 1947, Harold and Elsie Gelber, husband and wife, opened the Fox and Hounds Restaurant at the above location. The restaurant was owned by the Fox and Hounds Restaurant Company, a California corporation, referred to sometimes herein as Restaurant Company. The Gelbers owned all of the outstanding stock of Restaurant Company. The land and building where the restaurant was located was owned directly by the Gelbers. From its opening to its sale in 1954, the Fox and Hounds Restaurant grew steadily in patronage and reputation. It had an excellent regular following and catered largely to people in the upper income strata. Harold and Elsie Gelber devoted all their time and attention to the restaurant's business and were *81 responsible for its operation. About one-third of the restaurant's business was from charge account customers. Under the Gelbers, the name "Fox and Hounds" received favorable national publicity upon being mentioned by such newspaper columnists as Walter Winchell, Hedda Hopper, and Jimmy Starr. The restaurant obtained further publicity nationally when it received a write-up in Holiday magazine and on the occasion of a coast-to-coast telecast in or about July 1954, when it was presented with the Holiday award for excellent of food particularly, and also of service and atmosphere. [1]
In or about August 1952, the Gelbers entered into negotiations with Boyd J. and Emmett O'Donnell for the purchase by the latter of the land and building where the restaurant was located, and for the purchase of the restaurant as an operating business. The parties arrived at a satisfactory selling price of $300,000 for the land *82 and building and a like amount for the restaurant business, but as a condition, the Gelbers requested the O'Donnells to purchase insurance policies on their lives to protect the Gelbers against loss until the purchase price was paid. Upon the O'Donnells' refusal, negotiations ceased. The O'Donnells wanted to buy the assets of the Restaurant Company, but were uninterested in the corporation. As composing the restaurant assets, the negotiations were directed to the equipment and fixtures; a lot on an adjoining street, with a storage building on it; a liquor license; food and liquor inventory; accounts receivable of about $30,000; and good will. The O'Donnells estimated the value of the good will as the excess of the $300,000 purchase price over the value of the other assets. The O'Donnells had in mind the continued operation of the restaurant as the "Fox and Hounds," and in arriving at the purchase price were agreeable to the inclusion of good will at $90,000 to $100,000. Prior to December 9, 1952, Harold Gelber also conducted negotiations for the sale of the restaurant with Sheldon MacHenry, another local restaurateur. MacHenry was not interested in continuing the operation of the *83 restaurant as the "Fox and Hounds," but intended to change the name of the operation to "MacHenry's." His offer was much less than the Gelbers were willing to sell for, and was rejected. Fred Schmid is a professional consultant in the field of planning, designing and engineering food facilities of all kinds. He manages the firm of Fred Schmid Associates, of Los Angeles, the operations of which are not limited to the Los Angeles area. Prior to December 9, 1952, Schmid heard about Gelber's negotiations with MacHenry. Schmid contacted Gelber and told him there was a restaurant operator in Chicago who might be interested in buying the restaurant. Gelber furnished Schmid with detailed information about the operation of the restaurant and the properties for sale. Gelber personally conducted Schmid through the restaurant and showed him the furnishings, fixtures, facilities and equipment. By letter dated December 9, 1952, Schmid informed David Breitbart, a Chicago restaurateur, that the Fox and Hounds Restaurant was for sale; that the owners of the business also owned the land and building where the business was conducted; and that the land and building, worth approximately $300,000, *84 could also be purchased. Schmid advised Breitbart, who had been in the restaurant business for 30 years, that the restaurant operation was good, was about six years old, a combination liquor and food operation, with food accounting for 75 percent of the $800,000 volume in 1952, and that the restaurant had a total seating capacity of 293, with 150 seats in the main dining room, 75 seats in an adjoining private dining room, 50 seats in a cocktail lounge, and 18 seats in a bar. Schmid also advised Breitbart as follows: The owners want to sell the assets consisting of cash *, accounts receivable *, fixtures and equipment * (* worth approximately $325,000); on and off sale liquor licenses; one piece of property for customer parking approximately 100feet X 190feet (paid $47,000); inventory (over $50,000.00). They want $350,000 for the above. The letter further advised Breitbart that Schmid "never imagined the place was for sale because it does nothing but business and makes nothing but money." Schmid showed the letter to Gelber before he sent it to Breitbart. He had known Breitbart for many years. Upon receiving Schmid's letter, Breitbart telephoned his attorney in Los Angeles, Louis *85 A. Chase, and instructed him to contact Schmid and to negotiate for the purchase of the restaurant and the land and building. Chase and Breitbart had been friends for many years, and Chase as an attorney had participated in the purchase and sale of restaurants in Chicago. The negotiations with the Gelbers and their attorneys, Paul Gordon and Leonard Weinberg, extended over a period of about 18 months. During such period Chase met with the Gelbers, Gordon, and Weinberg 25 or 30 times to discuss different phases of the transaction. Breitbart attended a few of these conferences when in Los Angeles, and was otherwise kept informed about the progress of negotiations through telephone calls and conferences with Chase. During the course of the negotiations Breitbart and Schmid discussed various phases of the transaction with Chase separately and with each other. Throughout the negotiation the Gelbers were determined that the sale should be that of their corporate stock, not a sale of the corporate assets. During the period of negotiations, Breitbart made six trips to Los Angeles. On each trip he visited the Fox and Hounds Restaurant at least twice and personally examined and inspected *86 its facilities. As a result thereof, he was personally acquainted with the physical layout and the type of restaurant operation being conducted at the Fox and Hounds, and that such operation was profitable. He was also aware of the extent and the condition of the restaurant's furnishings, fixtures, inventories and other assets. Prior to May 1954, Chase had inspected the books and records of the Restaurant Company and was familiar with the values shown by the books for the assets, including that of the real property owned by Restaurant Company. The sales agreement was prepared by Gordon and Chase. In the course of this work, Chase brought up the matter of an agreement from the Gelbers not to compete within a radius of 20 miles from 2900 Wilshire Boulevard and suggested $16,000 of the amount to be paid for the stock as the amount to be allocated thereto. Gelber, upon being advised of the matter, suggested that the radius be fixed at 5 miles, but accepted a radius of 15 miles, and the covenant provision in the sales agreement was written accordingly. On May 13, 1954, the Gelbers and the Breitbarts consummated their purchase and sale transaction in the escrow department of the Bank *87 of California. The Gelbers, Gordon, Breitbart, Chase, and the trust officer of the bank were present at this time. The Gelbers and Breitbart executed the sales agreement, and made the Bank of California holder of the escrow deposit. By the terms of the agreement, Harold and Elsie Gelber, as sellers, sold to David Breitbart and his wife, as buyers, all of the outstanding shares of the capital stock of Fox and Hounds Restaurant Company, consisting of 5,000 shares, with a par value of $1 per share. In addition, the Gelbers sold to the Breitbarts the land and building where the restaurant was located. The purchase price of the stock was $300,000 and the purchase price of the land and building was $340,000. The Restaurant Company owned four other pieces of real estate, designated as Parcels A, B, C, and D in the agreement, and had various other assets used in the operation of the restaurant. The agreement provided that the purchase price of the stock was payable $215,000 in cash, and $85,000 in 36 "equal monthly installments, plus interest at 5 per cent (5%) on the unpaid balance * * * commencing May 1, 1954, secured by the present assets of the Corporation, plus the pledge of the stock *88 being purchased." The purchase price of the land and building was payable $15,000 in cash, and $325,000 in 180 equal monthly payments, plus interest at 5 percent on the unpaid balance, the first principal payment to be due three years after the date of the closing of the escrow, secured by a purchase money trust deed on such property, with interest to commence as of May 1, 1954. In addition, upon the liquidation and distribution of the assets of the Restaurant Company to the buyers, a trust deed on two of the four pieces of real estate distributed was to be delivered by the buyers to the sellers as additional security for payment of the $325,000. The agreement also provided that the buyers would deliver to the sellers a release from Fred Schmid for any and all claims for services rendered in connection with the sale being consummated. That such a release would be forthcoming was a factor leading to the acceptance by the Gelbers of a price for their stock which was less than had been asked. The provisions with respect to the covenant not to compete, set forth in paragraph 14 of part FIRST, provided as follows: 14. Sellers further agree, as an additional inducement for the purchase *89 by the Buyers of their stock and assets in the Corporation, that they will not compete as individuals or members of any partnership or corporation, with Fox & Hounds Restaurant, within a radius of fifteen (15) miles of 2900 Wilshire Boulevard, Santa Monica, California, for a period of eight (8) years from this date. Various paragraphs in the sales agreement refer to the "Balance Sheet" of the Restaurant Company as of the close of business on May 6, 1954, and paragraph 4 of part FIRST specifically provided that "a copy of which Balance Sheet is hereto attached, identified by signatures of the parties hereto, and expressly made a part hereof." Part FOURTH of the agreement, which also referred to the attached balance sheet, provided as follows: FOURTH: It is understood that the intention of the parties herein is that the Buyers purchase the assets and that the only manner of acquiring the said assets is through the medium of the purchase of all of the stock of the Corporation. It is understood that notwithstanding the fact that this transaction has taken the form of a purchase of stock in the Corporation that it is the intention of the parties to transfer and deliver full and complete *90 title to the assets of the Corporation, other than the Cadillac automobile, and to deliver the same to Buyers free and clear of all claims of every kind, nature and description other than those reflected by the Balance Sheet hereto attached. That in determining the purchase price of the stock and the assets thereby secured by the Buyers, there has been the following allocation of values and payment: As per Exhibit "B". The so-called "Balance Sheet" consisted of two schedules designated as Exhibits "A" and "B". Exhibit "A" purported to list current assets and liabilities, and it showed net current assets in the amount of $106,659. Exhibit "B" purported to list all assets and liabilities of the Restaurant Company, including net current assets, and indicated that assets exceeded liabilities by exactly $300,000, as follows: ASSETS
Current Assets [Listed in Exhibit
"A"]
$106,659
Deferred charges: Liquor License
5,200
Prepaid Insurance
4,774
Organization Expense
245
Leasehold Improvements
5,922
Parking Lot and Storge Building
(Yale)
15,629
Parking Lot (Yale)
15,742
Land at 17th & Wilshire
21,380
810 Wilshire - Land
17,678
2901 Wilshire - Land
24,800
Pontiac automobile
2,500
Sign
1,761
Office Equipment
5,683
Kitchen service; glassware; silver;
drapes; furniture and furnishings;
restaurant equipment inclusive of
all personal property connected
with operations of restaurant and
bar as per appraisal
125,729 [1]
Agreement of Sellers not to compete
16,000
Total
$369,702
LIABILITIES
Current Liabilities [Listed in
Exhibit "A"]
$22,081
Due for Federal Income Tax
37,900
Due on Trust Deed on 810
Wilshire
9,721
$ 69,702
$300,000
*91 The sales agreement contained no reference to good will either in the body of the instrument or in Exhibits "A" and "B" attached thereto. On the day he executed the agreement Breitbart departed for Chicago and did not return to Los Angeles until sometime in June. He and Gelber had agreed that announcement of the change of ownership would be postponed until the escrow was closed. Accordingly, the Gelberts continued their management and operation of the restaurant *92 through the month of June and received a salary for their services. On or about July 1, 1954, the escrow was closed and Breitbart took possession. Just prior thereto, Britbart was introduced to a few of the supervisory employees as the new owner of the business. At or about this time, the newspapers publicized the fact that the Fox and Hounds Restaurant had changed hands and that David Breitbart of Chicago was the new owner. At the time Breitbart took over the operation and management of the Fox and Hounds Restaurant, it had on hand 60 cases of souvenir matches, 100,000 souvenir menus, office stationery, and an inexpensive sign over the sidewalk. The total value of these items was approximately $5,000. The balance sheet of the Restaurant Company at the close of business on June 30, 1954, showed assets and liabilities as follows: ASSETS
Cash
$ 67,540.99
Notes and Accounts Re-
ceivable
$ 30,789.37
Less: Reserve for bad
debts
3,056.93
27,732.44
Inventories - food and liquor
19,132.11
Investments: Securities
1,500.00
Liquor License
5,200.00
6,700.00
Other Assets: Deferred charges
6,855.58
Franchise Tax Refund
1,932.05
Advances
2,427.32
Land
78,613.50
Depreciable Assets
(Schedule A)
111,522.92
Less: Reserve for De-
preciation
44,973.35
66,549.57
Total Assets
$277,483.56
LIABILITIES
Accounts Payable and Accrued Ex-
penses
$ 37,265.24
Mortgages Payable
9,422.84
Taxes Payable
12,672.12
Federal Income Tax Payable 1953-
1954
20,844.98
Federal Income Tax Payable 1954
3,182.90
Capital Stock
5,000.00
Earned Surplus
189,095.48
Total Liabilities
$277,483.56
*93 The following table shows the cost, the reserve for depreciation and the undepreciated balance of the various categories of depreciable assets included in the balance sheet of the Restaurant Company on June 30, 1954: Cost
Reserve
Balance
Restaurant, etc. Assets
Restaurant Equipment
$ 29,281.52
$11,396.87
$17,884.65
Kitchen Serviceware
3,733.24
2,002.46
1,730.78
Glassware, etc.
16,061.76
9,730.82
6,330.94
Furniture and Fixtures
9,151.83
3,577.10
5,574.73
Drapes and Decorations
4,072.51
2,213.89
1,858.62
Total Restaurant, etc. Assets
$ 62,300.86
$28,921.14
$33,379.72
Office Furniture and Equipment
$ 7,174.56
$ 2,800.06
$ 4,374.50
Neon Signs
3,577.80
1,936.16
1,641.64
Leasehold Improvements
17,842.47
8,456.68
9,385.79
Automotive Equipment
3,493.38
1,382.63
2,110.75
Parking Lot Signs
489.06
183.36
305.70
Parking Lot Improvements
16,644.79
1,293.32
15,351.47
$ 49,222.06
$16,052.21
$33,169.85
Total Depreciable Assets
$111,522.92
$44,973.35
$66,549.57
The items listed above under the heading "Restaurant, etc. Assets" cover the categories which had been carried into Schedule B to the sales agreement at *94 the balancing figure of $125,729. In addition to the depreciable assets shown on the balance sheet of the Restaurant Company at June 30, 1954, the Breitbarts also obtained certain other depreciable assets, situated in the restaurant, which were owned by the Gelbers and were not reflected on the books and records of the Restaurant Company. These assets were refrigerators, sinks, ranges, dishwasher, worktables, meat cutter, kitchen equipment, sofa, cash registers, electrical fixtures, chairs, carpets, bar, booths, and tables. Such assets were shown on Gelber's books as having been acquired in 1947, at a total cost of $38,797.50, that depreciation taken thereon to April 30, 1954, totaled $26,602.73, and that their book value and depreciated cost on April 30, 1954, was $12,194.77. Under the agreement of sale, the Gelbers had covenanted and agreed with the Breitbarts that Restaurant Company was the true and lawful owner of the restaurant, "together with all its contents, assets, business, including all goods, wares, merchandise, apparatus, fixtures, equipment and personal property of every kind, nature and description contained in, on or about the said restaurant, and that no other person, *95 firm, corporation or governmental body has any lien, claim, right, title or interest, legal, equitable or otherwise whatsoever in, to or against any of the tangible or intangible assets of the company or any part thereof." Shortly after the close of escrow, the Restaurant Company was dissolved and liquidated. All of the restaurant assets and the covenant not to compete were distributed to the Breitbarts, who sold an undivided 25 percent interest in the distributed assets and in the land and building to their attorney, Louis Chase. The Breitbarts and Chase transferredthe restaurant business and assets, including therein Gelber's covenant not to compete, to petitioner in exchange for its capital stock, after which the stock was owned 75 percent by the Breitbarts and 25 percent by Chase. The opening balance sheet of Fox & Hounds, Inc., the petitioner herein, on July 1, 1954, listed assets and liabilities as follows: ASSETS
Current Assets
Cash
$67,540.99
Accounts Receivable
$30,789.37
Less: Reserve for bad debts
3,056.93
27,732.44
Miscellaneous Receivables
4,359.37
Inventories
19,132.11
Prepaid Expenses
5,750.58
Total Current Assets
$124,515.49
Depreciable Assets
156,967.32
Land
79,600.27
Deferred Charges
Agreement not to Compete
16,000.00
Liquor License
5,200.00
Deposits
1,105.00
Total Deferred Charges
22,305.00
Total Assets
$383,388.08
LIABILITIES
Accounts Payable
$ 26,951.22
Sales Tax Payable
4,035.11
Accrued Expenses
7,421.46
Accrued Wages
2,892.56
Accrued Property Taxes
3,000.00
Payroll Taxes Payable
5,637.01
Federal Income Taxes Payable (Fox and Hounds Restaurant Com-
pany)
24,027.88
Notes Payable
309,422.84
Total Liabilities
$383,388.08
*96 The breakdown of the $156,967.32 listed as depreciable assets on petitioner's balance sheet of July 1, 1954, was as follows: Restaurant, etc. Assets: Restaurant Equipment
$67,228.07
Kitchen Services
6,505.74
Glassware, Silverware
23,797.08
Furniture and Furnish-
ings
20,955.13
Drapes and Decorations
6,986.30
Total Restaurant, etc. Assets
$125,472.32
Office Furniture and
Equipment
5,683.00
Signs
1,761.00
Leasehold Improvements
5,922.00
Auto
2,500.00
Parking Lot and Building
15,629.00
31,495.00
Total Depreciable Assets
$156,967.32
No amount was set up on the books and records of the petitioner to reflect the acquisition of any good will. An amount of $16,000 was set up as the cost of the agreement not to compete. Presumably the assets to which the $125,472.32 was allocated included the items of restaurant equipment acquired directly from the Gelbers as well as the equipment acquired from the Restaurant Company. In or about May 1954, Chase had asked Schmid to make a survey and appraisal of the equipment and furnishings as they were in place at the restaurant. In July of 1954, an employee of Fred Schmid Associates inventoried *97 and appraised certain equipment and furnishings at the restaurant. In the letter transmitting such appraisal, dated September 21, 1954, Chase was advised, in part, as follows: These figures are not accurate to the dollar but are only a close approximation. The costs generally reflect current replacement values and do not indicate the true value of the individual item. Some pieces of equipment may have been fully depreciated. We have not taken into consideration the condition of the various items but have estimated the costs on the basis of replacement today. There may be a duplication of items appearing on this list as compared to lists prepared by others. The appraisal reflected generally the cost of currently replacing new the items of furniture and furnishings listed for the three dining rooms, the bar, lounge, foyer, vestibule, and checkroom, which aggregated $25,209, and the items of equipment listed in the kitchens, pantry, bar, locker rooms, compressors, and other service areas, which aggregated $75,951, or a total of $101,160. Glassware, silverware, linens, kitchen service, supplies, and dishes were omitted from this inventory and appraisal. The only drape listed and *98 appraised was a draw drape at the bar, with an estimated cost of $300. The appraisal made no allowance for any costs of installation or connection of the equipment and fixtures. Breitbart paid Schmid $10,000 for his services in connection with the purchase of the Fox and Hounds Restaurant, $9,500 of which was represented as "finder's fee" and $500 as payment for the written appraisal aforementioned. In each of the years 1949 through 1954, there was an increase in the cost of restaurant fixtures and equipment. After Breitbart took over the restaurant, the operation was continued substantially as before. The continued use of the name Fox and Hounds was in fact emphasized by the erection of a sign about two and one half times the size of the original sign. There was no change of any moment in the physical structure or decoration of the various areas comprising the restaurant or the uses to which they were put. An effort was made to emphasize the service of drinks away from the bar area to tables. Breitbart personally took over the buying of food, which under Gelber had been done by the chef. He also increased the prices for both food and drinks. He found some customers objectionable *99 and took steps to discontinue their patronage. He used more newspaper advertising and discontinued the employment of a publicity man. [2] The charge business continued as before at approximately one-third of total business. On its income tax return for the taxable year ended June 30, 1955, petitioner reported sales of $780,972.72 and a net loss for the year of $7,943.90. In determining such net loss, it deducted $54,073.23 for depreciation of fixed assets, and $2,000 for amortization of the agreement not to compete. In computing its depreciation allowance, it used as its basis the individual amounts shown in the breakdown of depreciable assets listed on its balance sheet of July 1, 1954, in the aggregate amount of $156,967.32. It computed an aggregate depreciation allowance of $48,797.20 on these assets, of which $43,784.68 was its aggregate allowance on "Restaurant, etc. *100 Assets," shown on its balance sheet as having an aggregate basis of $125,472.32, and $5,012.52 of which was the aggregate depreciation allowance on the remaining depreciable assets, shown as having an aggregate basis of $31,495. The remainder of petitioner's depreciation deduction, that is, $5,276.03 ($54,073.23 minus $48,797.20), represented depreciation on depreciable assets acquired after July 1, 1954. Amortization of Gelber's covenant not to compete was computed upon an eight year life and the $16,000 allocation in the sales agreement. In the depreciation schedule attached to its return, covering the depreciable assets acquired in its acquisition of the Fox and Hounds Restaurant, all items being described as "used," petitioner, after showing July 1, 1954, as the date of acquisition, listed varying periods, ranging from a low of 14 months for glassware and silverware to a high of 219 months for parking lot and building, as the periods of useful life remaining from the date of acquisition for the various categories of assets covered. Applying the rate indicated by the periods of useful life so listed to the bases at which the assets had been entered on its books, it arrived at *101 the amounts of depreciation composing the aggregate amount claimed as shown above. The respondent in his determination of deficiency allowed $18,592.74 of the $54,073.23 claimed and deducted by petitioner, and disallowed $35,480.49 as excessive. In making his determination, he listed the items making up the various categories at cost according to their dates of acquisition by Restaurant Company and computed the depreciation thereon up to July 1, 1954, the date acquired by petitioner, according to the useful life of the items in question, and after reducing basis by the amount of depreciation so computed, he used such depreciated cost as the basis for computing depreciation for petitioner for the remaining useful life of the assets as of July 1, 1954, and in so far as appears, the periods of useful life remaining are not in dispute. Thus, of the total cost of $300,000 to the Breitbarts for the business and assets of the Fox and Hounds, he allocated as the cost of the depreciable assets in question amounts which were equal to the undepreciated cost of the assets to the Restaurant Company at July 1, 1954. The respondent also disallowed the $2,000 deducted by petitioner on its return *102 as representing allowable amortization of a covenant by Gelber not to compete, stating in the notice of deficiency that the disallowance was because of lack of substantiation that there was a covenant not to compete for which a consideration was paid. At the time of the sale of the Restaurant Company stock to Breitbart, Gelber had no intent to again enter the restaurant business. It was his intent to build and operate a bowling alley. He already owned the land and had the plans therefor. The bowling alley project was completed in about a year after the Fox and Hounds stock sale. In conjunction with the bowling alleys, Gelber constructed a bar and a coffee shop. The coffee shop would seat 34 patrons. [3]
Some two years later, Gelber began the construction of a restaurant which became known as the Plush Horse in Redondo Beach, some 25 miles from the Fox and Hounds. The Plush Horse, which was opened in December of 1956, was larger than the Fox and Hounds and *103 had greater facilities for banquets. Included in the assets acquired through the purchase of the stock of Restaurant Company and transferred to petitioner for its stock was the item of good will having a substantial value. Good will was one of the assets of Restaurant Company acquired by Breitbart for the lump sum of $300,000 and a proper part thereof, when related to and compared with the total of the other assets also acquired, represented cost of the good will. As to $129,532.68 of the total cost of $300,000 for the restaurant assets, the parties are agreed that the amounts allocated by petitioner as the cost of specified assets are just and proper, and to that extent the allocations are not in dispute. Of the remaining $170,467.32, $28,995 has been spread between four items, office equipment, leasehold improvements, sign, and parking lot and garage building; $16,000 has been set up as the cost of a covenant on the part of Gelber not to compete; and $125,472.32 has been allocated among five items heretofore referred to as "Restaurant, etc. Assets," being the items lumped together in Schedule B of the sales agreement as having cost $125,729, which was the balancing figure required *104 to bring the excess of the amounts allocated to the various restaurant assets over liabilities assumed to exactly $300,000, the total cost to Breitbart for the restaurant business and assets. No part of the $300,000 has been allocated to good will, likewise acquired in the purchase. To the four items to which petitioner has allocated an aggregate of $28,995, the respondent in his determination has in fact allocated an aggregate amount of $31,059.10. Although as to two of the items the amounts allocated by petitioner were greater than those ascribed thereto by the respondent, whereas the reverse is true as to the other two, and there being no claim by petitioner that the aggregate amount as determined by respondent is excessive, it is found that respondent's allocations were proper. Of the remaining $125,472.32 allocated by petitioner as the cost of the five items representing "Restaurant, etc. Assets" and the $16,000 allocated as the cost of a covenant not to compete, a substantial part represents the cost of good will. The respondent in his allocation of cost to the "Restaurant, etc. Assets" has failed to allocate any of the $125,472.32 to cover the increases in the cost of *105 such restaurant fixtures and equipment shown to have occurred during the period 1949 through 1954. Making due allowance for the importance and value of the good will acquired in and to the business, a proper and correct amount to be allocated as the cost of the "Restaurant, etc. Assets" requires an increase of one percent for each of the years during the period the assets were owned and in use up to July 1, 1954, the pertinent date herein. [4]
In addition to the "Restaurant, etc. Assets" previously owned by Restaurant Company, the depreciable assets acquired by petitioner in the $300,000 transaction also included *106 the restaurant fixtures and equipment theretofore owned by the Gelbers personally. Similarly, the depreciated cost of these assets increased in the same manner to allow for the rising cost of restaurant equipment during the period used in the business will indicate the proper allocation of cost thereto. After these allocations from the $125,472.32 to the assets specified, the remainder properly represents the cost of good will. Opinion The parties are in apparent agreement, no issue being raised or argument made to the contrary, that though as to the Gelbers the transaction between them and the Breitbarts was a sale of Restaurant Company stock, it was for the Breitbarts a purchase of the business and assets of Restaurant Company. Kimbell-Diamond Milling Co. v. Commissioner, 187 F. 2d 718, affirming 14 T.C. 74; Commissioner v. Ashland Oil & Refining Co., 99 F. 2d 588; United States v. Mattison, 273 F. 2d 13; Georgia-Pacific Corporation v. United States, 264 F. 2d 161; and James F. Suter, 29 T.C. 244. The first issue is whether petitioner claimed excessive depreciation in any amount and, in particular, *107 in the amount of $35,480.49. The disallowance is the result of differences between the parties as to the amounts to be allocated from the total cost of $300,000 as the cost of particular assets to arrive at the basis of the assets in the hands of petitioner, and for the purposes here is limited to the $125,472.32 allocated by petitioner as the cost of five categories of equipment, namely, kitchen serviceware, drapes and decorations, glassware and china, furniture and fixtures, and restaurant equipment, which are sometimes referred to herein in a group as "Restaurant, etc. Assets." It is the position of the respondent that the Breitbarts in a package purchase acquired good will having a value of between $106,000 and $198,000, and that that part of the $125,472.32 in excess of the depreciated cost of the said assets at June 30, 1954, represented cost of good will. Petitioner argues that good will was never bargained for during the course of negotiations, that the sales agreement, made between diverse independent parties represented by counsel, contained no provision for good will, that the purchasers did not desire to purchase nor did they believe they were purchasing any good will, *108 that none of the purchase price was paid for good will, and that, since no good will was purchased, petitioner could not place such an item on its books. Petitioner further contends that good will does not exist where the corporate stock and the tangible assets have an equal value. (A)-5 (A)-5 (A)-5 Section 1.167 (a)-5, Income Tax Regulations, provides for apportionment of the basis of property in the case of the acquisition of a combination of depreciable and nondepreciable property for a lump sum. In such circumstances, "the basis for depreciation cannot exceed an amount which bears the same proportion to the lump sum as the value of the depreciable property at the time of acquisition bears to the entire property at that time." If the contracting parties comply with the Commissioner's regulations in making their allocation of cost, a stepped-up basis for depreciable assets may be allowed under the Kimbell-Diamond, Ashland and Mattison cases, supra. Petitioner seeks a stepped-up basis as to the disputed assets, and relies on the allocation appearing in Schedule B attached *109 to the sales agreement. Respondent attacks the allocation relied on by petitioner on the ground that the allocation failed to include the good will and going concern value of the Fox and Hounds Restaurant as an asset acquired in the purchase of the restaurant business and its assets. The opposing contentions raise the question of whether good will existed, and if so, whether it was purchased. For present purposes, it is sufficient to regard good will as the sum total of those imponderable qualities which attract the custom of and brings patronage to the business. Grace Bros. v. Commissioner, 173 F. 2d 170, 173. See also Matter of Brown, 150 N.E. 581, 582; Menendez v. Holt, 128 U.S. 514, 522; and Malcolm J. Watson, 35 T.C. 203, 213, for other definitions of good will. We agree with respondent that good will was one of the assets acquired by the Breitbarts in their purchase of the Gelber stock. At that time, the Fox and Hounds Restaurant had been operating for about seven years. Its reputation and its patronage had grown steadily. It *110 catered largely to people in the upper income brackets and about one-third of its business was derived from the charge account customers. It had received nationwide publicity from newspaper columnists and the Holiday magazine award. Its operations were profitable. During the five years preceding the sale, its annual taxable net income averaged $59,342. The average of its total assets, as reflected by balance sheets in its returns, for the same period had been $196,852. Although good will did not appear as an asset in any of the balance sheets, in the books and records of the two corporations, or as an item in the sales agreement, and was not discussed as such in the negotiations between the parties, good will was, nevertheless, a factor in the transaction. See Grace Bros. v. Commissioner, supra; Copperhead Coal Co. v. Commissioner, 272 F. 2d 45, 48; and North American Service Co., 33 T.C. 677, 694. The proof of record convinces us that Breitbart recognized the existence of good will as an asset of the business and that it was a very important factor leading to his purchase of the Fox and Hounds. After he took over, he continued operating *111 the business substantially as it had been operated previously. He used the same location, the same name, the same general arrangement of facilities and substantially the same staff and service personnel, and while some changes in policy and method of operating occurred, by and large, the Fox and Hounds continued to operate substantially as before, to the end that it would derive all of the benefits that could be obtained by trading on the good will and going business value of its predecessor. See United States v. M.O.J. Corporation, 274 F. 2d 713. Under these circumstances, we may look beyond the formal dealings between the contracting parties to see if the forms they used reflect the substance of their transaction. Schultz v. Commissioner, 294 F. 2d 52, and cases cited. Petitioner cites and relies on Cohen v. Kelm, 119 F. Supp. 376, and Commissioner v. Chatsworth Stations, Inc., 282 F. 2d 132, for the proposition that good will does not exist where a corporation's tangible asset value equals or exceeds the value of its stock. Even *112 if such a rule can be deduced from the cases cited, they also stand for the established principles that where a going business is sold, good will is transferred even though the bill of sale does not mention good will, see also Pfleghar Hardware Specialty Co. v. Blair, 30 F. 2d 614; that in such a sale the burden is on the taxpayer to show not only the basis of each asset, but also the portion of the selling price fairly attributable to each asset; that the Commissioner is not bound by the parties' allocation of the purchase price among the various assets sold, but may allocate such price according to what he deems to be the realities of the transaction; and that if the taxpayer attacks the Commissioner's allocation, the taxpayer has the burden of proof. To support its burden of proof, petitioner offered testimony and documentary evidence as showing that there was an allocation of the purchase price by the parties among the assets sold in accordance with their fair market value. Petitioner's *113 evidence was directed primarily to the so-called "Restaurant, etc. Assets" listed on the balance sheets of June 30, 1954, and July 1, 1954. This was on the theory that, except for the covenant not to compete, no substantial question concerning the value of the other assets listed on such balance sheets existed. Petitioner urges that the $125,472.32 value indicated in the listing of assets as representing the "Restaurant, etc. Assets" was a product of intensive and lengthy negotiations between opposing parties, ably represented by counsel, and that valuation at that figure is supported by the opinion testimony of Breitbart and Schmid, and by an independent appraisal of the restaurant equipment, furniture and fixtures made in July of 1954. It is argued further that the appraisal did not cover or include the depreciable assets, carried on Gelber's personal books and records at a cost of $40,000. Petitioner also contends that respondent's witness, O'Donnell, confirmed its valuation of its tangible assets, in that he testified that his deal to purchase the stock of the Fox and Hounds Restaurant Company excluded cash and real property acquired by petitioner, aggregating $131,399.01, plus *114 the covenant not to compete, valued by petitioner at $16,000. From this, it is argued that if O'Donnell was to acquire tangible assets valued at $200,000 from the Gelbers, then petitioner acquired tangible assets having a value of $331,000 by its purchase, since the value of the real property and the cash is not here in dispute. At this point, it may be observed that while seeking support from O'Donnell's testimony for its contention as to the fair market value of depreciable assets, petitioner, through the citation of Cohen v. Kelm, supra, and Commissioner v. Chatsworth Stations, Inc., supra, discussed above, apparently seeks to by-pass the testimony of O'Donnell as to the presence of good will having a value of $90,000 to $100,000. We agree that the lump sum finally arrived at by the Breitbarts and the Gelbers was the end result of lengthy negotiations. We do not agree that the allocation of the purchase price among the assets acquired was one of the subject matters negotiated. We are satisfied from the evidence that the allocation was made primarily by Chase for the buyers' benefit tax-wise. It was acquiesced in by Gelber only after assurance by Gordon, *115 his attorney, that his interests were not involved or affected. We are not persuaded, therefore, that the $125,472.32 was a negotiated allocation between the parties. It was, in our opinion, an allocation which, in substance, was unilateral and is of little, if any, probative weight in determining the fair market value of the depreciable assets involved or the allocable portion of the purchase price thereto. The opinion testimony of Breitbart is self-serving and in many instances was in the nature of general assertions and conclusions. Specifically, he testified that, "On the basis of the physical properties of this restaurant, I bought this restaurant very, very, very cheap." There is no particularity in his testimony as to the value of the "Restaurant, etc. Assets," or any other asset or group of assets, and such testimony could denote that the presence of good will was one indication of the cheapness of the purchase price. He also based his opinion in part on the "observation of the expert that I employed," namely, Schmid. The latter had based his valuation in part on his own observation of the restaurant and in part on the appraisal made by one of his employees in July of 1954. *116 The appraisal made in July of 1954 by one of Schmid's employees is the only written appraisal of the assets in question of which we are advised. It does not purport to be accurate, complete, or indicative of true value. It specifically points out that some items may have been fully depreciated, that some may be a duplication of items listed elsewhere, and that no consideration was given to the condition of the various items inventoried. Actually, the appraisal is no more than a listing of various restaurant items with an approximation of what it would cost in or about July 1954 to purchase such items new, without including the costs of assembly, installation, or connection. Such an inventory and appraisal is of little, if any, assistance in resolving the question of a proper allocation of cost to the particular assets herein, which is the question before us. Nevertheless, Schmid testified that having regard for the appraised total of $101,675 for the inventoried assets, the costs of installation and connection with public utilities, his own personal knowledge of the condition of the restaurant and its physical assets, and the fact that costs of such equipment had increased 5 percent *117 a year for some five years prior to the critical date, it was his opinion that the depreciable assets in question had a value equal to the amount allocated to them. Schmid based his opinion in part on the fact that the assets were fixtures and equipment "in place in an operating restaurant," that such assets took on an additional value when "set up in an integrated or going concern pattern," and that the value of the restaurant and its assets "would certainly be greater in [an] operating business" because "it is producing revenue." While under such circumstances the assets might or possibly would have a lesser value if offered separately as used equipment, the presence of going concern value could likewise indicate the presence of good will, which is the intangible respondent contends petitioner has ignored in making an inflated allocation to the basis of its depreciable assets. And, where good will is present and is sold as part of a package transaction, there would still remain the necessity, under the regulations, of a proper allocation of cost between tangible assets and good will according *118 to the values of each. Petitioner's argument that the depreciable assets carried on Gelber's personal books of account were not inventoried in the $101,675 appraisal appears to be more speculative than factual. It is established that Gelber purchased certain restaurant equipment and furnishings in 1947. These assets were used by the corporation in the operation of its restaurant business, but were never transferred to the corporation and never appeared as assets on the corporate books. We have found the aggregate cost of these items to be $38,797.50, and that their depreciated cost or book value at April 30, 1954, was $12,194.77. By the terms of the sales agreement, particularly paragraph 5 of part FIRST, the Gelbers transferred to the Breitbarts all of the restaurant assets owned individually as well as all of their interests in the restaurant assets owned by the corporation as represented by the corporate stock. Under these circumstances, and considering the nature of these assets and their daily use as necessary and integral parts of the restaurant operation, it would be most unlikely that they were passed over and omitted from the inventory and appraisal placed in evidence. If *119 there was any such omission, the burden was on petitioner to prove it. On the contrary, the appraisal specifically lists and values over 500 separate items of restaurant equipment and furnishings, and includes items of every type carried on Gelber's individual books of account. We are satisfied that the restaurant assets carried on Gelber's personal books were included by Schmid's employee in the inventory and appraisal. While we are unable to accept the $125,472.32 valuation contended for by the petitioner, we are of the opinion that a just and proper allocation of cost as between the assets in question and good will does require an allocation to the "Restaurant, etc. Assets" of more than an amount equal to the depreciated cost of the assets at June 30, 1954, as disclosed by the Restaurant Company books. In the first place, the books of the corporation did not reflect the assets carried on Gelber's personal books of account but which had also been acquired by petitioner in the $300,000 purchase which had been made by Breitbart. Furthermore, we are satisfied on the evidence that the prices at which restaurant equipment could be purchased on the open market had increased to some extent *120 during the five years preceding. Schmid, in his testimony, expressed the opinion broadly that the increase had been as much as 5 percent per year from 1949 through 1954. We do not know what definite and exact evidence would show, but we do feel that to insure a proper allocation of cost as between the assets in question and good will, some allowance is required for such increases in the going prices of restaurant equipment. The evidence as to the facts needed to supply the basis for allocation is far from definite and leaves much to be desired, but after considering the evidence we do have, we have made findings as best we could to arrive at a proper allocation of cost among the Fox and Hounds assets acquired by petitioner as shown herein. See and compare Cohan v. Commissioner, 39 F. 2d 540. As for the covenant not to compete, respondent has determined that there was no covenant not to complete for which a consideration was paid. It was the testimony of Breitbart that he didn't particularly care about having a covenant not to compete, but when Chase brought it up, he regarded it as a part of Chase's job with respect to the transaction and so accepted it, since he *121 "still wouldn't have liked to have [Gelber] in business across the street." As for Gelber, the insertion of the agreement did not affect the amount of consideration he was to receive, and it was his testimony that he had already voluntarily stated that he was going into the bowling alley business and did not intend to go into the restaurant business, and when Chase indicated a desire for such a provision, he agreed but suggested that the limitation be fixed at a radius of five miles. It does not appear, however, that he resisted the fifteen mile limit when it was suggested. He did in fact build the Plush Horse some two and one half years later, which was located in Redondo Beach, some 25 miles distant. He also built and operated a bar and coffee shop, which would seat 34 patrons, in conjunction with his bowling alley operation. He did not, however, regard the coffee shop and bar as being anything "like" the Fox and Hounds. Whether it was within the proscribed area, does not appear, but if it was, petitioner, if aware of it, made no objection under the agreement not to compete and may have agreed with the view of Gelber, that it was not competitive. Such being the state of the record, *122 we do not think the petitioner has shown that there was a bona fide negotiated covenant not to compete, rather than an insertion of a provision into the agreement at the instigation of Chase for income tax purposes. The respondent's disallowance of the deduction claimed is accordingly sustained. At this point, it may be stated that in our disposition of the depreciation issue above, we did not overlook the impact of the conclusion here reached as to the covenant not to compete to the extent that it might bear upon a proper allocation of cost between good will and tangible assets. Decision will be entered under Rule 50. Footnotes
1. Gelber thought the telecast occurred in 1953; Breitbart was certain it occurred in July 1954, shortly after he took over operation of the Fox and Hounds Restaurant. In any event, it is evident that the award was earned during the period the Gelbers operated the restaurant.↩
1. At the time of the execution of the sales agreement there had in fact been no appraisal of the items mentioned other than the independent conclusions of the parties in the course of their negotiations. The relation between book values and the figures at which the various assets were listed is not shown. According to Chase, the amount listed for restaurant equipment and furnishings of $125,729 was a balancing figure arrived at in order to show that assets exceeded liabilities by $300,000, which was the purchase price. Gelber withdrew his objections to the $125,729 figure when informed by his counsel that his interests were not involved and that the amount represented part of the purchasers' setup for their income tax.↩
2. It was Breitbart's view that the most substantial change was the substitution of his presence and personality for that of Gelber. It was also his view that a better quality of food was purchased and served under his management, in the case of beef in particular, and that he was by far the better operator.↩
3. According to Gelber, the bar and coffee shop operation was nothing like the Fox and Hounds. Whether it was located within five miles, fifteen miles, or more than fifteen miles from the Fox and Hounds, does not appear.↩
4. The schedules and tabulations comprising a part of the record herein indicate that the necessary facts are available to the parties for the purpose of making the above indicated computations to arrive at the amount by which the depreciated cost at July 1, 1954, is to be increased so as to reflect the proper cost of the various assets to petitioner. These schedules appear to show the dates of acquisition of the various assets by Restaurant Company and by Gelber, and we do not understand that the over-all useful life for assets in the various categories is in dispute.↩