Cosmopolitan Credit Corporation v. Commissioner.
Cosmopolitan Credit Corp. v. Commissioner
Docket No. 3628-69.
United States Tax Court
T.C. Memo 1972-103; 1972 Tax Ct. Memo LEXIS 154; 31 T.C.M. (CCH) 404; T.C.M. (RIA) 72103; May 3, 1972, Filed Dougal C. Pope, Houston 1st Savings Bldg., Houston, Tex., for the petitioner. R. James Curphy, William T. Overton, and Robert Liken, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: Respondent determined deficiencies in petitioner's income taxes as follows: Year Ended
Addition to Tax
Deficiency
May 31
Income Tax
§6653(a)
§6653(b)
1959
$1,941.57
$ 970.79
1960
4,598.55
2,932.36
1961
1,568.57
784.29
1962
2,351.78
$117.59
1963
3,071.85
153.59
1964
575.84
28.79
1965
122.21
The issues to be decided are: (1) Whether deductions taken in each of the years in question were ordinary and necessary expenses of petitioner's business. (2) Whether petitioner *156 is entitled to a deduction for an accrued salary expense for compensation payable to its president but not actually paid within two and one-half months after the close of petitioner's taxable year ending May 31, 1960. (3) Whether petitioner received additional income in taxable years ending May 31, 1960, 1961, 1962, and 1963 attributable to the understatements of bad debt recoveries. (4) Whether any part of the deficiencies in each of the taxable years ended May 31, 1959, through May 31, 1961, inclusive, is due to fraud with intent to evade tax within the meaning of section 6653(b). [1]
(5) Are the deficiencies due from petitioner for taxable years ending May 31, 1962, through May 31, 1964, attributable to negligence or intentional disregard of rules and regulations within the meaning of section 6653(a). Findings of Fact Some of the facts have been stipulated and are, together with the exhibits attached to the stipulation, incorporated herein by this reference. Cosmopolitan Credit Corporation (hereinafter sometimes referred to as C.C.C.), formerly known as Carr Investment *157 Corporation, was incorporated under the laws of the State of Louisiana in May of 1955 and at all relevant times maintained its principal place of business in Shreveport, Louisiana. C.C.C. filed corporate income tax returns for each of the years in question with the district director of internal revenue at New Orleans, Louisiana. C.C.C. employed a fiscal year ending May 31 and maintained its books and records on the accrual basis of accounting. C.C.C. is engaged in the business of making loans in excess of $300. The business is owned and operated by Claude C. Carr (hereinafter sometimes referred to as Carr). Carr was both president and chairman of the board of directors during the years in issue. He personally maintained close control over the business and dominated every phase of the operation of C.C.C. from its inception until at least taxable year ended May 31, 1965. Carr was the only corporate officer with authority to issue checks on C.C.C.'s checking account, and he alone issued and signed all checks involved herein. He owned 99 percent of the outstanding shares of C.C.C. stock outright and the remaining one percent was held by Elizabeth Erholm, an employee of C.C.C., in trust *158 for Carr.
In addition to Elizabeth Erholm, who served as secretary, treasurer, member of the board of directors and office manager, C.C.C. employed Doris O. Saucier as the office secretary. During the course of each of the years in question C.C.C. issued numerous checks payable to third parties, petty cash, or to Carr. The expenditures were recorded on petitioner's books as being made for various business purposes, the majority being charged to advertising and travel accounts with occasional entries to office supplies, auto expense, entertainment, and miscellaneous. The checks referred to, on a year-by-year basis, are as follows: Taxable Year
Ended May 31, 1959 Date of
Check
Amount of
Account Charged
Check
Payee
Number
Check
Name
Amount
7/25/58
Skaggs Drug
2807
$ 20.21
Advertising
$ 20.21
Co.
9/27/58
Skaggs Drug
2907
54.88
Advertising
54.88
Co.
1/20/59
Skaggs Drug
3292
26.98
advertising
26.98
Center
Total Year
$ 102.07
Ended May 31,
1959
Taxable Year Ended
May 31, 1960
7/29/59
Skaggs Drug
3878
$ 34.12
Advertising
$ 34.12
Center
9/21/59
United
4077
41.93
Advertising
41.93
Wholesale
Jewelers
12/22/59
B. F. Goodrich
4445
26.42
Auto expense
26.42
Stores
2/27/60
Hudson Vitamin
4627
34.70
Advertising
34.70
Products
3/8/60
Business
4652
13.77
Office supplies
13.77
Record Service
Total Year
$ 150.94
Ended May 31,
1960
Taxable Year Ended
May 31, 1961
12/9/60
C. C. Carr
5681
$ 89.64
Travel
$ 89.64
12/30/60
C. C. Carr
5785
300.00
Travel
300.00
11/19/60
Diners Club
5613
254.64
Travel
254.64
11/8/60
American
5557
20.88
Travel
20.88
Express
3/9/61
American
6048
42.86
Travel
42.86
Express
12/17/60
C. C. Carr
5729
300.00
Entertainment &
300.00
Donation
11/17/60
Sears Roebuck
5559
$ 19.72
Auto expense
$ 19.72
& Co.
4/28/61
Browns Floral
6237
8.37
Miscellaneous
8.37
Shop
4/28/61
Holiday In
6238
25.00
Advertising
25.00
Drive
Total Year
$1,061.11
Ended May 31,
1961
Taxable Year Ended
May 31, 1962
7/6/61
Hardy O'Neal
6557
$168.36
Travel
$ 168.36
Arns Travel
Agcy.
10/2/61
Diners Club
6808
228.59
Travel
228.59
12/5/61
LePetit Motel
7051
92.70
Travel
92.70
12/30/61
Roosevelt
7183
50.00
Travel
50.00
Hotel
2/28/62
Diners Club
7422
16.40
Travel
16.40
8/29/61
Diners Club
6672
115.04
Entertainment &
115.04
donation
Total Year
$ 671.09
Ended May 31,
1962
Taxable Year Ended
May 31, 1963
12/18/62
Monteleone
8546
$ 25.00
travel
$ 25.00
Hotel
12/18/62
Hilton Inne
8547
95.82
Travel
95.82
2/8/63
Flournay
8781
155.75
Entertainment &
155.75
Jewelers
donation
Total Year
$ 276.57
Ended May 31,
1963
Taxable Year Ended
May 31, 1964
Unknown
Petty cash
1-338
$102.60
Travel
$ 75.81
Office supplies
24.90
Recording -
1.89
filing fees
Unknown
Petty cash
1-340
134.39
Advertising
66.00
Office supplies
16.80
Entertainment &
29.99
promotion
Recording -
21.60
filing fees
Unknown
Petty cash
1-350
75.00
Advertising
30.00
Miscellaneous
42.00
Recording -
3.00
filing fees
Unknown
Petty cash
1-368
124.40
Office supplies
55.25
Travel
31.80
Entertainment &
24.60
promotion
Miscellaneous
12.75
Unknown
Kidd Ruso
Unknown
86.80
Advertising
86.80
Unknown
Rubenstein
Unknown
33.05
Advertising
33.05
Dept. Store
Unknown
United
Unknown
26.08
Advertising
26.08
Jewelers
12/19/63
Lester Carr
9684
60.00
Entertainment &
60.00
promotion
11/19/63
Diners Club
9537
64.03
Entertainment &
64.03
promotion
1/22/64
Plaza Hotel
9846
51.56
Entertainment &
51.56
promotion
12/18/63
American
9657
112.45
Travel
112.45
Express
1/31/64
American
9899
53.92
Travel
53.92
Express
12/19/63
Lester Carr
9684
90.00
Travel
90.00
Total Year
$1,014.28
Ended May 31,
1964
Taxable Year Ended
May 31, 1965
12/17/64
Lester Carr
10976
$163.50
Travel
$163.50
12/21/64
Delta Airlines
10999
164.75
Travel
164.75
Total Year
$328.25
Ended May 31,
1965
*159 Carr personally negotiated many of the checks set forth above at the Commercial National Bank of Shreveport, Louisiana, the bank upon which the checks were drawn. The checks made to petty cash were simply presented for payment and those made to third party payees were endorsed by Carr in the name of the payee and presented for payment. The proceeds received from the checks were either deposited in C.C.C.'s bank account as a contribution to capital or unaccounted for. C.C.C. claimed a deduction on its income tax returns for taxable years May 31, 1959, through May 31, 1965, for each specific category of expenses set out above. The checks not handled in this fashion were in payment for Carr's personal expenses. In addition to the above transactions which occurred throughout the taxable years in question, C.C.C. ostensibly made a flurry of disbursements at or very near the close of each year. C.C.C.'s books and records reflect the following schedule of expenditures and their purpose: 408 Taxable Year Ended May 31, 1959
Date of
Check
Amount of
Check
Payee
Number
Check
5/30/59
Giddens-Lane Building
3664
$1,200.00
5/28/59
Petty cash
3665
1,638.39
5/28/59
E. J. Coen
3666
510.00
5/29/59
Petty cash
3667
1,221.45
5/28/59
B. M. Carr
3668
900.00
5/30/59
Lester M. Carr
3669
900.00
Total Taxable Year
May 31, 1959
Taxable Year Ended May 31, 1960
5/27/60
Giddens-Lane Building
4955
$1,200.00
5/27/60
B. M. Carr
4956
1,000.00
5/27/60
Lester Carr
4957
1,000.00
5/27/60
Petty cash
4959
1,197.00
5/31/60
Petty cash
4961
1,416.00
5/30/60
E. J. Coen
4962
345.00
5/30/60
Petty cash
4963
1,065.00
5/31/60
Petty cash
4966
360.00
5/31/60
Petty cash
4967
1,022.00
Total Taxable Year
May 31, 1960
Taxable Year Ended May 31, 1961
5/31/61
Petty cash
6398
$1,146.00
5/30/61
Petty cash
6399
342.00
5/30/61
Petty cash
6400
210.00
5/31/61
Postmaster
6402
450.00
5/31/61
Giddens-Lane Building
6403
1,200.00
5/31/61
Petty cash
6404
399.24
Total Taxable Year
May 31, 1961
Taxable Year Ended May 31, 1962
5/31/62
C. C. Carr Ins. Agcy.
Unknown
$1,500.00
5/31/62
Petty cash
7744
1,441.10
5/31/62
Petty cash
7745
1,122.00
5/31/62
Petty cash
7746
1,143.90
5/31/62
Petty cash
7751
457.00
Total Taxable Year
May 31, 1962
Taxable Year Ended May 31, 1963
5/27/63
J. B. Handcock
9053
$ 660.00
5/27/63
Postmaster
9055
276.00
5/28/63
Petty cash
9058
771.63
5/30/63
Paul Johnson
9059
270.00
5/30/63
J. B. Handcock
9060
612.00
5/30/63
Albert Gaston
9061
456.00
5/30/63
Postmaster
9062
300.00
5/30/63
Petty cash
9063
675.93
5/30/63
James Lewis
9064
324.75
5/31/63
Petty cash
9065
849.72
5/31/63
Giddens-Lane Building
9066
1,500.00
5/24/63
L. Robinson
9052
276.42
Total Taxable Year
May 31, 1963
Taxable Year Ended May 31, 1964
5/27/63 [1]
Martha Ayers
9054
$ 672.00
5/28/63 [1]
James Leasis
9057
171.00
Total Taxable Year
May 31, 1964
*160 Taxable Year Ended May 31, 1959
Date of
Date Paid
Account Charged
Check
or Cashed
Name
Amount
5/30/59
8/20/60
Rent
$1,200.00
5/28/59
8/17/60
Advertising
540.30
Auto expense
720.90
Collection
324.75
Telephone & telegraph
52.44
5/28/59
1/15/60
Legal
510.00
5/29/59
8/20/60
Office supplies
150.45
Entertainment and
promotion
525.00
Insurance - general
51.00
Postage
445.00
Miscellaneous
50.00
5/28/59
8/20/60
Director's fees
900.00
5/30/59
8/17/60
Director's fees
900.00
$6,369.84
Taxable Year Ended May 31, 1960
5/27/60
9/1/60
Rent
$1,200.00
5/27/60
9/1/60
Director's fees
1,000.00
5/27/60
9/1/60
Director's fees
1,000.00
5/27/60
9/1/60
Advertising
1,020.00
Donations
177.00
5/31/60
9/1/60
Office supplies
126.00
Entertainment and
promotion
600.00
Postage
690.00
5/30/60
9/1/60
Legal
345.00
5/30/60
9/1/60
Telephone & telegraph
120.00
Travel
945.00
5/31/60
9/1/60
Automobile
240.00
Filing & recording
120.00
5/31/60
9/1/60
Collection
902.00
Miscellaneous
120.00
$8,605.00
Taxable Year Ended May 31, 1961
5/31/61
6/28/61
Advertising
$1,146.00
5/30/61
6/28/61
Collection
246.00
Entertainment and
promotion
81.00
Donations
15.00
5/30/61
6/28/61
Office supplies
210.00
5/31/61
6/29/61
Postage
450.00
5/31/61
6/29/61
Rent
1,200.00
5/31/61
6/29/61
Office supplies
3.24
Miscellaneous
384.00
Dues & subscriptions
7.50
Clerk of Court
4.50
$3,747.24
Taxable Year Ended May 31, 1962
5/31/62
6/8/62
Rent
$1,500.00
5/31/62
6/5/62
Advertising
1,441.10
5/31/62
6/8/62
Collection
996.00
Miscellaneous
126.00
5/31/62
6/5/62
Office supplies
90.00
Entertainment and
promotion
150.00
Insurance - general
108.00
Postage
795.90
5/31/62
6/5/62
Miscelllaneous
152.00
Travel expenses
305.00
$5,664.00
Taxable Year Ended May 31, 1963
5/27/63
9/ /63
Advertising
$ 660.00
5/27/63
Missing
Postage
276.00
5/28/63
9/4/63
Travel expense
597.63
Miscellaneous
174.00
5/30/63
9/6/63
Office supplies
270.00
5/30/63
9/6/ 3
Advertising
612.00
5/30/63
9/6/63
Collection
456.00
5/30/63
Missing
Postage
300.00
5/30/63
8/27/63
Entertainment and
promotion
675.93
5/30/63
9/6/63
Collection
324.75
5/31/63
9/4/63
Auto expense
621.00
Miscellaneous
159.72
Various others
69.00
5/31/63
Missing
Rent
1,500.00
5/24/63
9/6/63
Miscellaneous
276.42
$6,972.45
Taxable Year Ended May 31, 1964
5/27/63 [1]
9/6/63
Collection
$ 672.00
5/28/63 [1]
9/6/63
Collection
171.00
$ 843.00
*161 Carr admittedly forged the payee's endorsement on a number of the checks allegedly written in payment of the above expenses. The forgeries were often deceptively executed in a style of handwriting different from Carr's usual style. Checks numbered 3666 and 4962 above were written to one E. J. Coen, an attorney, allegedly for legal expenses. During the fiscal years ending May 31, 1959, and May 31, 1960, Coen performed no legal services either for C.C.C. or Carr. In addition Coen never received the checks or the proceeds therefrom. Carr, without authorization, endorsed Coen's name on the checks, cashed them, and either retained the funds or deposited them in C.C.C.'s account. Lester V. Carr and B. M. Carr are the brothers of Claude C. Carr. Lester was vice president and a member of the board of directors of C.C.C. during the taxable years in question. During the taxable years ended May 31, 1959, and May 31, 1960, however, he performed no services for C.C.C. Neither check number 3669 nor check number 4957, written to Lester Carr 410 and charged to an account for director's fees, was received by Lester. In fact, both checks were falsely endorsed *162 by Claude C. Carr in the name of the payee, negotiated at the Commercial National Bank and the proceeds either retained or deposited in C.C.C.'s account. B. M. Carr was neither a director nor officer during any of the years in question and performed no services for C.C.C. Checks numbered 3668 and 4956, written to B. M. Carr and charged to a director's fees account, were never received by B. M. Carr. They too were falsely endorsed by Claude C. Carr, presented for payment at the bank on which they were drawn and the proceeds were then either retained by Carr or deposited in C.C.C.'s account. Check number 6402 is a $450 check written to the postmaster on May 31, 1961, and charged to an account labeled "postage." The postmaster never received the check or payment in lieu thereof and it too was falsely endorsed by Claude C. Carr, presented for payment at the bank on which it was drawn and the proceeds deposited in C.C.C.'s account. As set out above, during the last week of May 1959 through 1963 C.C.C. issued a series of petty cash checks in amounts varying from $210 to $1,638.39 and charged the items to various expense accounts. C.C.C. has no receipts or other comparable documentation *163 substantiating the legitimacy or business purpose of any of the expenses. Moreover, many, if not all, of the checks to petty cash were presented for payment to the Commercial National Bank by Claude C. Carr and deposited in C.C.C.'s account. In each instance where Carr made the deposits set forth above in C.C.C.'s checking account a corresponding increase was made to Carr's capital account. C.C.C.'s books and records relative to Carr's capital account for taxable years 1959 through 1962 were as follows: May 31, 1959
Date
Source of Capital Increases or
Amount
Decreases
5/31/58
Opening balance per 1959 return
$ 60,250.00
Unknown
Unknown
6,500.00
5/31/59
Balance per books and return
$ 66,750.00
May 31, 1960
12/11/59
Cash received from Carr
$ 2,000.00
12/16/59
Cash received from Carr
3,000.00
12/22/59
Cash received from Carr
1,000.00
1/11/60
Cash received from Carr
1,000.00
5/31/60
Adjustment
(2,500.00)
5/31/60
*13Balance per books and return
$ 71,250.00
May 31, 1961
7/ 5/60
Cash received from Carr
$ 3,000.00
7/ 9/60
Cash received from Carr
2,000.00
8/13/60
Cash received from Carr
2,500.00
8/16/60
Various corporate checks deposited
2,400.00
to corporation account
8/19/60
Cash received from Carr
6,000.00
8/25/60
Cash received from Carr
5,000.00
8/31/60
Cash received from Carr
2,000.00
9/ 1/60
Various corporate checks deposited
9,605.00
to corporate account
1/28/61
Cash received from Carr
2,000.00
2/10/61
Cash received from Carr
2,000.00
2/18/61
Cash received from Carr
2,500.00
5/31/61
Balance per books and return
$110,255.00
May 31, 1962
6/ 5/61
Cash received from Carr
$ 3,000.00
6/ 8/61
Cash received from Carr
1,974.00
6/28/61
Various corporate checks deposited
2,097.24
to corporate account
6/29/61
Various corporate checks deposited
1,652.76
to corporate account
7/ 7/61
Cash received from Carr
6,150.00
9/18/61
Cash received from Carr
1,500.00
9/30/61
Corporate check issued to Carr as
6,000.00
salary and deposited
4/25/62
Cash received from Carr
2,250.90
5/31/62
Balance per books and return
$134,879.90
*164 411 The entry of September 1, 1960, set forth above, consists of the following checks which were deposited in C.C.C.'s checking account on September 1, 1960: Check Number &
Amount
Voucher Number
Payee
of Check
4955
Giddens-Lane Co.
$1,200.00
4959
Petty cash
1,197.00
4962
E. J. Coen
345.00
4956
B. M. Carr
1,000.00
4957
Lester V. Carr
1,000.00
4961
Petty cash
1,416.00
4963
Petty cash
1,065.00
4966
Petty cash
360.00
4967
Petty cash
1,022.00
4958
Claude C. Carr
1,000.00
$9,605.00
The capital account entry of June 28, 1961, set forth above, consists of the following checks negotiated by Carr and deposited in C.C.C.'s checking account on that same date: Check Number &
Amount
Voucher Number
Payee
of Check
6398
Petty cash
$1,146.00
6399
Petty cash
342.00
6400
Petty cash
210.00
6404
Petty cash
399.24
$2,097.24
It has been stipulated that Carr entered a plea of guilty and was sentenced on one count of making and subscribing to, under the provisions of section 7206(1), a false corporate income tax return filed for C.C.C. for the taxable year ended May 31, 1959. *165 In addition to all of the items discussed above, in each of the years before us petitioner occupied a portion of the office space which was leased by Carr or Claude C. Carr Insurance Agency from Giddens-Lane Company, Inc. The reasonable annual rental value of petitioner's office space was $1,200 for each of the first three taxable years in question and $1,500 for taxable years ending May 31, 1962, and 1963. Checks made in payment for rent were written to Giddens-Lane Building. Giddens-Lane did not receive the checks. The checks in fact were falsely endorsed by Carr, negotiated at the Commercial National Bank, and deposited in C.C.C.'s checking account. Rent for the entire premises was, however, paid to Giddens-Lane Company, Inc., by Carr. C.C.C. claimed on its income tax return for the taxable year ended May 31, 1960, a deduction for accrued compensation payable to Carr in the amount of $6,000. In December 1960 petitioner made an entry on its books and records for accrued compensation payable to Carr, and the amount was eventually paid September 30, 1961. Carr computes his taxes on the cash method of accounting. During the taxable years ended May 31, 1960, through May 31, 1965, C. *166 C.C. utilized the reserve method of accounting for bad debts. Recoveries of bad debts were recorded as gross income. For each of the taxable years ending May 31, 1960, through May 31, 1963, petitioner had bad debt recoveries in excess of those reported for income tax purposes. For each year the figures are as follows: Amount of
Year Ending
Recoveries on
Amount
May 31
Bad Debts
Reported
1960
$ 356.39
$ 79.00
1961
535.35
447.00
1962
1,675.51
534.36
1963
2,544.64
None
Opinion The first issue to be decided is whether the various alleged disbursements made by petitioner are properly deductible. With respect to this determination petitioner asserts that the deficiencies involved were reached in an arbitrary and capricious fashion, hence shifting the burden of proof to respondent. This assertion, however, is wholly lacking in merit. The two bases on which petitioner relies are both fallacious. Petitioner relies first on the disallowance of a rental expense and secondly, on a rather wholesale disallowance of items charged to petty cash. As will be set out in detail below, the rental expense, while perhaps presenting an issue decidable *167 in petitioner's favor, in no way forms the basis for a charge of arbitrary and capricious. The facts indicate that the transaction by which petitioner paid rent was highly unusual, deceptive, and deserving of suspicion. The question of whether a rental expense should be allowed was exceedingly close and under no definition can respondent's disallowance be classified as arbitrary or capricious. Petitioner's reliance on the wholesale disallowance of the petty cash expenditures as an arbitrary and capricious determination is likewise erroneous. Respondent was not arbitrary and capricious, but on the contrary quite reasonable and, in fact, correct. No other reasons having been pressed as indicating an arbitrary determination on respondent's behalf, we conclude that petitioner's allegations must be spurned. Petitioner, via its primary officer and controlling shareholder, Claude C. Carr, has seen fit to conduct a substantial portion of its business activity in a highly questionable manner. Numerous disbursements were 412 purportedly made and fictitiously entered as expense items on petitioner's books and records. The records were then employed in completing petitioner's tax returns *168 resulting in erroneous deductions. Many such disbursements were made during the entire course of the taxable years before us, with an uncommon acceleration occurring at or near the end of each year. Most of the checks involved were negotiated by Carr, and either diverted for his own use or deposited in C.C.C.'s checking account. With the exception of the checks that the parties agree were written in payment for Carr's personal expenses, none of the checks have been received by the designated payee. Petitioner does not seriously contend otherwise. Petitioner does contend that the amounts in question, while disguised as various and sundry expenses, were really compensation to Carr and so disguised by him in order to evade personal income tax. Petitioner therefore concludes that the expenditures, while not deductible in the form taken, should be lumped together and allowed as a deduction for compensation. This is an interesting and novel approach - however, it is derived from hindsight and contains little substance. The entire plan, as is evidenced by the record, reveals no suggestion that petitioner intended the various disbursements to constitute compensation. On the contrary, we think *169 that the cyclical nature of the route taken by the checks here involved is convincing evidence that compensation was not their purpose. The checks were written and signed by Carr, deductible entries were made in the corporate books, the checks were then taken by Carr to the bank on which they were drawn, negotiated, and, for the most part, returned to petitioner's checking account. Neither Carr, nor anyone else, received any direct, material benefit from this merry-go-round method of generating deductions. The corresponding entries made to Carr's capital account are not, in this context, sufficient to warrant a conclusion that he received compensation or, more importantly, that petitioner so intended. The burden of disproving respondent's determination is on petitioner. Rule 32, Tax Court Rules. He has produced not one shred of credible evidence indicating the legitimacy of the expenditures in question. Such a barren record necessarily dictates a conclusion in respondent's favor. We likewise find the record inadequate to support an application of the doctrine set forth in *170 Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930). Application of that rule is only proper where we are otherwise convinced that a portion of claimed and unsubstantiated deductions were in fact legitimate. This is not the case here. The second and yet more serious question is whether any portion of the deficiencies for taxable years ending May 31, 1959, through May 31, 1961, was due to fraud, thus justifying imposition of the 50 percent fraud penalty. [2]
The burden of proof in establishing fraud rests with respondent and requires a showing of clear and convincing evidence. *171 See section 7454; Mitchell v. Commissioner, 118 F. 2d 308 (C.A. 5, 1941); and Frank Imburgia, 22 T.C. 1002 (1954). Fraudulent conduct on the part of corporate officers is imputed to the corporation and will justify a holding of fraud. Elmer J. Benes, 42 T.C. 358 (1964), affd. 355 F. 2d 929 (C.A. 6, 1966), certiorari denied 384 U.S. 961 (1966); Auerbach Shoe Co., 21 T.C. 191 (1953), affd. 216 F. 2d 693 (C.A. 1, 1954). That Carr possessed the requisite fraudulent intent has been made abundantly clear. We are persuaded by ineluctable evidence that the transactions occurring herein were part of a fraudulent scheme to generate false deductions. Only the most obvious and noteworthy examples will be dealt with in particular. Two checks, one in 1959 and one in 1960, were written to one E. J. Coen for legal services never performed. The checks, issued and signed by Carr, were then falsely endorsed in the name of the payee and eventually redeposited in petitioner's checking account. Similar circumstances surround the four checks written to Lester Carr and B. M. Carr, Claude's two brothers. Checks payable *172 to them for director's services never performed, were issued and signed by Carr, falsely endorsed and redeposited in petitioner's account. Lastly, a check written 413 to the postmaster, for postage never purchased, followed the same cycle. These are but several of the numerous instances that constitute a fraudulent scheme by petitioner's president to generate illegitimate deductions. Respondent need only show that a part of the deficiency is attributable to fraud and the penalty will apply to the entire deficiency. Arlette Coat Co., 14 T.C. 751 (1950). The above instances alone are sufficient to establish the fraudulent conduct of petitioner. Petitioner argues that the conduct of its president, Carr, was part of his personal scheme to deceive the government as to his individual income and hence should not be attributed to the corporation. We disagree. The facts do not indicate that Carr was so motivated. Moreover, we think the language used by the Circuit Court in Auerbach Shoe Company v. Commissioner, 216 F. 2d 693, 697 (C.A. 1, 1954), affirming *173 21 T.C. 191 (1953), is particularly appropriate here: In the first place it is hardly conceivable that Auerbach was acting solely for his direct personal benefit and account when he filed fraudulent returns for the petitioner. No doubt he hoped by filing those returns to conceal his wrongful diversion of corporate property and his fraudulent understatement of income in his personal returns. But when creditors' rights are not involved, and so far as the record discloses creditors' rights were not involved here, there is as little point in a sole stockholder cheating his corporation as there is in cheating at solitaire unless, of course, tax consequences result. Thus, while no doubt Auerbach had a purely personal motive in falsifying the petitioner's returns, we think it an inescapable inference that he must also have had a motive to benefit the petitioner by reducing its taxes, whereby he would also stand to gain substantially, although indirectly as its stockholder. The fraud penalty imposed above covers only three of the years before us; to wit, taxable years ending May 31, 1959, through May 31, 1961. Respondent has asserted a penalty under section 6653(a)[3] for taxable *174 years ending May 31, 1962, through May 31, 1964. It is well settled that respondent's determination of negligence or intentional disregard of rules and regulations is presumptively correct, and the burden of disproving the allegation rests with petitioner. David Courtney, 28 T.C. 658 (1957). Petitioner has placed nothing in evidence to contradict the allegation of negligence. In addition, the record is replete with ample evidence warranting the conclusion that petitioner, at the very least, failed to exercise reasonable care in maintaining accurate books and in computing its tax liability. We find little, if any, difficulty in sustaining respondent's imposition of the negligence *175 penalty. Three remaining items must be singled out and dealt with separately. The first relates to the checks made out to Gidden-Lane Building and charged to rent. C.C.C. occupied a portion of the office space leased by Carr or his insurance company. The rent for the entire premises was paid and deducted by Carr. The rental payments ostensibly made by petitioner to Giddens-Lane never reached the payee and were diverted by Carr. The rental payments, however, were reasonable and in fact were in payment for the use of office space. That Carr chose to have them made payable to a third party payee - for whatever reason - causes them to be no less payments of rent. We therefore conclude that petitioner is entitled to a deduction for the rental payments made, deducted, and disallowed by respondent. There is also in issue the deductibility of $6,000 in accrued but unpaid compensation for the taxable year ending May 31, 1960. Determination of this issue is governed by section 267. The requirements of this section are clearly set out within the statute and are as follows: SEC. 267. LOSSES, EXPENSES, AND INTEREST WITH RESPECT TO TRANSACTIONS BETWEEN RELATED TAXPAYERS. (a) Deductions *176 Disallowed. - No deduction shall be allowed - * * * (2) Unpaid Expenses and Interest. - In respect of expenses, otherwise deductible under section 162 or 212, or of interest, otherwise deductible under section 163, - (A) If within the period consisting of the taxable year of the taxpayer and 2 1/2 months after the close thereof (i) such expenses or interest are not paid, and 414 (ii) the amount thereof is not includible in the gross income of the person to whom the payment is to be made; and (B) If, by reason of the method of accounting of the person to whom the payment is to be made, the amount thereof is not, unless paid, includible in the gross income of such person for the taxable year in which or with which the taxable year of the taxpayer ends; and (C) If, at the close of the taxable year of the taxpayer or at any time within 2 1/2 months thereafter, both the taxpayer and the person to whom the payment is to be made are persons specified within any one of the paragraphs of subsection (b). (b) Relationships. - The persons referred to in subsection (a) are: * * * (2) An individual and a corporation more than 50 percent in value of the outstanding stock of which *177 is owned, directly or indirectly, by or for such individual; In the case now before us petitioner, an accrual basis taxpayer, seeks to deduct $6,000 of compensation actually paid to Carr some 16 months after the close of the taxable year in question. Carr, a cash basis taxpayer, was not required to include the payment in his income until payment was made. In addition, at all relevant times Carr effectively owned or controlled 100 percent of petitioner's stock. This case is a model for application of section 267. Petitioner argues that Carr, the recipient of the compensation, constructively received the payment within 2 1/2 months of the close of petitioner's tax year. While constructive receipt may provide an escape hatch under proper circumstances, it has not been proven to exist here. There was no corporate action taken in this regard within the 2 1/2 month period: no corporate resolutions, no entry on the books, and no effort of any kind to set the funds aside and/or put them at Carr's unfettered disposal. There is nothing indicating he had any right to the money whatsover until the first entry was made in petitioner's records in December of 1960, well after the passing of the *178 2 1/2 months. Certainly Carr, by virtue of his control of the corporation, had the power to draw a corporate check in payment of the accrued compensation. However, it is well established that the application of the doctrine of constructive receipt is controlled by the right, as distinguished from the power, to receive funds. Hyland v. Commissioner, 175 F. 2d 422 (C.A. 2, 1949), affirming a Memorandum Opinion of this Court. In Hyland the court said, in part: * * * No doubt it is true that the taxpayer by reason of his very large stock ownership, could have effectively directed the various agents having charge of the corporation's bookkeeping and financial affairs to take action to make available to him the necessary cash and to draw a check in his favor for the amount claimed by him for 1942 services. But he did not do so; indeed, there is no evidence that he even knew of the directors' resolution authorizing his compensation before he received it. The argument that the rule of constructive receipt becomes applicable with the mere possession of such power, without any indication of an intent to exercise it, proves too much. It would mean that in every close corporation *179 the corporate earnings are immediately constructively received by the controlling stockholder provided their withdrawal would not make the corporation insolvent. * * * We think that where, as here, the controlling stockholder treats himself as a creditor and the corporation as his debtor, he must, if he invokes the doctrine of constructive receipt, prove that the requirements of the Regulations have been satisfied. He does not make such proof merely by showing that he owns more than 50% of the corporation's outstanding stock. * * * Petitioner's final contention is that if the amount in issue cannot be deducted in the taxable year ended May 31, 1960, then it is allowable in the year ended May 31, 1962, when actual payment was subsequently made. This position is contrary to sec. 1.267(a)-1 (b)(2), Income Tax Regs., which provides in part: * * * if the accrued expenses or interest are paid after the deduction has been disallowed under section 267(a)(2), no deduction would be allowable for the taxable year in which payment is made, since an accrual item is deductible only in the taxable year in which it is properly accruable. *180 We have no quarrel with the regulations and on one occasion have given approval to its import; see North American Service Co., 33 T.C. 677 (1960). [4] 415 We do have serious reservations as to whether the item of compensation was properly accruable as a deduction in taxable year ended May 31, 1960, and may in fact be properly accruable in taxable year ended May 31, 1961, or even for that matter, 1962. This speculation is meaningless, however, since petitioner has not presented evidence at trial, nor pressed by way of argument on brief, that the compensation is accruable in any year other than 1960. We therefore conclude, as respondent urges, that the item is properly accruable and deductible only in 1960 and that section 267 precludes its deduction in that year. The last question to be considered is whether petitioner had additional income attributable to the unreported *181 recovery of bad debts. In the statutory notice of deficiency respondent determined that during the taxable years ended May 31, 1960, through May 31, 1963, petitioner received bad debt recoveries in excess of the amounts reported on its income tax returns as follows: Bad Debt
Reported on
Amount
Year Ended
Recoveries
Return
Understated
5/31/60
$ 356.39
$ 79.00
$ 277.39
5/31/61
535.35
447.00
88.35
5/31/62
1,675.51
534.36
1,141.15
5/31/63
2,544.64
None
2,544.64
The amount of bad debt recoveries received by petitioner in each taxable year has been stipulated by the parties, and there is no dispute as to the amount shown on petitioner's Federal income tax returns as "recoveries on bad debts." Thus, respondent contends it is obvious that petitioner has understated bad debt recoveries in his computation of taxable income in each taxable year at issue. Petitioner, nevertheless, contends that the actual bad debt recoveries in excess of that reported on the income tax return as "recoveries on bad debts" have in fact been reported somewhere in gross income. Such a vague and ambiguous contention is obviously insufficient to even *182 approach carrying petitioner's burden of proof. On the basis of the record before us we must conclude in favor of respondent. Decision will be entered under Rule 50. Footnotes
1. All section references are to the Internal Revenue Code of 1954, unless otherwise indicated.↩
1. Charged to expense 10/31/63↩
2. SEC. 6653. FAILURE TO PAY TAX. (b) Fraud. - If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a). In the case of a joint return under section 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse.↩
3. SEC. 6653. FAILURE TO PAY TAX. (a) Negligence or Intentional Disregard of Rules and Regulations With Respect to Income or Gift Taxes. - If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the under-payment.↩
4. The Seventh Circuit in North American Service Co. v. Commissioner ordered that this case be remanded and disposed of in accordance with a stipulated settlement. This, however, does not affect the vitality of the opinion as an expression of the Tax Court's views on the issue involved.↩